THE PLANTERS' BANK OF MISSISSIPPI, PLAINTIFFS IN ERROR, v. THOMAS L. SHARP, EDWARD ENGLEHARD, AND HENRY HAMPTON BRIDGES, DEFENDANTS IN ERROR.

MATTHIAS W. BALDWIN, GEORGE VAIL, AND GEORGE HUFTY, MERCHANTS AND PERSONS IN TRADE UNDER THE NAME, STYLE, AND FIRM OF BALDWIN, VAIL, & HUFTY, PLAINTIFFS IN ERROR, v. JAMES PAYNE, ABNER E. GREEN, AND ROBERT Y. WOOD, DEFENDANTS IN ERROR.

Where a bank was chartered with power to " have, possess, receive, retain, and enjoy to themselves and their successors, lands, rents, tenements, hereditaments, goods, chattels, and effects of what kind soever, nature, and quality, and the same to grant, demise, alien, or dispose of for the good of the bank," and also " to receive money on deposit and pay away the same free of expense, discount bills of exchange and notes, and to make loans," &c., and, in the course of business under this charter, the bank discounted and held promissory notes, and then the legislature of the State passed a law declaring that " it shall not be lawful for any bank in the State to transfer, by indorsement or otherwise, any note, bill receivable, or other evidence of debt; and if it shall appear in evidence, upon the trial of any action upon any such note, bill receivable, or other evidence of debt, that the same was transferred, the same shall abate upon the plea of the defendant,"— this statute conflicts with the Constitution of the United States, and is void.

THESE two cases were both brought up, by writ of error issued under the twenty-fifth section of the Judiciary Act, from the High Court of Errors and Appeals for the State of Mississippi.

They were kindred cases, and were argued together. Although the court pronounced an opinion in each case separately, yet the dissenting opinion of Mr. Justice Daniel treats them as they were argued, and hence it becomes necessary to blend the two cases together. The facts in each case will be stated, then the arguments of counsel, and then the opinions of the court, with the separate opinion of Mr. Justice McLean, and the dissenting one of Mr. Justice Daniel.

PLANTERS' BANK v. SHARP AND OTHERS.

On the 10th of February, 1830, the legislature of Mississippi

passed "An act to establish a Planters' Bank in the State of Mississippi."

The sixth section of the charter enacts, among other things, that the bank "shall be capable and able, in law, to have, possess, receive, retain, and enjoy to themselves and their successors, lands, rents, tenements, hereditaments, goods, chattels, and effects, of what kind soever, nature, and quality, not exceeding in the whole six millions of dollars, including the capital stock of said bank, and the same to grant, demise, alien, or dispose of for the good of said bank."

The seventeenth section gives power "to receive money on deposit and pay away the same free of expense, discount bills of exchange and notes, with two or more good and sufficient names thereon, or secured by a deposit of bank or other public stock, and to make loans to citizens of the States in the nature of discount on real property, secured by mortgage," &c.

The twenty-second section enacted, "that it shall not be lawful for said bank to discount any note or notes which shall not be made payable and negotiable at said bank."

By a supplement to the charter, passed in 1831, and accepted by the bank, it was provided that "such promissory notes shall be made payable and negotiable on their face at some bank or branch bank."

On the 24th of May, 1839, Sharp, Engelhard, and Bridges gave their promissory note to the Planters' Bank for one thousand dollars, due twelve months after date. A copy of the note is not to be found in the record, but the declaration states it to have been "payable and negotiable at the office of the Planters' Bank of the State of Mississippi, at Monticello."

On the 21st of February, 1840, the legislature of Mississippi passed "An act requiring the several banks of the State to pay specie, and for other purposes," the seventh section of which was as follows: — "It shall not be lawful for any bank in this State to transfer, by indorsement or otherwise, any note, bill receivable, or other evidence of debt; and if it shall appear in evidence, upon the trial of any action upon any such note, bill receivable, or other evidence of debt, that the same was transferred, the same shall abate upon the plea of the defendant."

In October, 1841, the Planters' Bank brought a suit upon the note in the Circuit Court of Lawrence county (State court). The defendants pleaded the general issue, and a jury was sworn. The declaration and note having been read, the defendants filed the following plea: —

"And now, at this day, that is to say, on the second day of the term aforesaid, until which day this cause was last continued, come the said plaintiffs, by attorney, and the said defend-

ants, by attorney; and the said defendants say, that since the last continuance of this cause, that is to say, since the sixth day of the May term, 1842, of this court, from which day this cause was last continued, and before this day, that is to say, on the 10th day of June in the year 1842, at the county aforesaid, the said plaintiffs then and there being the owners of the said note sued on in this cause, and then and there being a bank within the State of Mississippi, and within the intent and meaning of the statute of this State, entitled, 'An act requiring the several banks in this State to pay specie, and for other purposes,' transferred the aforesaid note to the United States Bank of Pennsylvania, contrary to the statute in such cases made and provided; and this the said defendants are ready to verify; wherefore they pray judgment if the said plaintiffs ought further to be answered in this said action, and that the same may abate.

"Personally appeared in open court Thomas L. Sharp, one of the defendants in the above-stated case, who, being duly sworn, upon his oath says, that the matters and things set forth in the above plea are true in substance and fact. Sworn to and subscribed in open court. THOMAS L. SHARP."

The plaintiffs demurred to this plea, upon the following grounds: —

1st. Because said plea is not assigned by counsel.

2d. Because said plea does not state the day, year, time, and place of the transfer of said note.

3d. Because the plaintiffs have a right by law to deal in promissory notes, bills of exchange, &c., secured by charter.

4th. Because the statute, the title of which is recited in said plea, is, so far as relates to transfers of notes, bills receivable, or other evidence of debt, unconstitutional.

5th. That said plea does not state to what term said cause was continued.

6th. That said plea does not allege that said note was transferred for value received.

7th. That said plea is a plea in bar of this action, but does not conclude in manner and form as provided by law.

8th. That said plea was not presented until issue joined under the plea of *non assumpsit*, and the declaration and note read, and a jury impanelled to try said issue.

9th. That the statute referred to in said plea does not affect the plaintiffs.

10th. That the said defendants did not tender the costs of suit in said case, up to the time of their tendering said plea, with said plea.

11th. That said plea is not entitled in this cause.

12th. That the affidavit subjoined to said plea is not sufficient.

The defendants having joined in demurrer, the court, after argument, overruled it, and leave being granted to the plaintiffs to reply to the plea, an issue was joined in short by consent, and the cause proceeded, when the jury found a verdict for the defendants.

A bill of exceptions was taken by the plaintiffs' counsel, as follows, viz. : —

" Be it remembered, that on the trial of the above cause at the term aforesaid, after the case was submitted to the jury, and after the plaintiff had introduced his evidence upon the issue joined, the defendant introduced a witness, who proved that, since the suit in the above case was instituted, the note had been transferred to the United States Bank of Pennsylvania, the defendants offered a plea, in the words and figures following, to wit : [Then followed the plea above recited.]

" To the reception of said plea the counsel for the plaintiffs objected, which objection was overruled ; to which opinion of the court the counsel for plaintiffs except, and having reduced their exceptions to writing before the jury retired, pray the same may be signed [and] sealed.

" Given under my hand and seal this 6th December, 1842.
　　'(Signed,)　　　　　　　A. G. BROWN. [SEAL.] "

Upon this exception, the case was carried up to the High Court of Errors and Appeals, which, at December term, 1842, pronounced the following judgment : —

" This cause having been submitted at a former term of this court, and the same having been duly considered by the court, it is ordered and adjudged, that the judgment of the Circuit Court of Lawrence county, rendered against the plaintiffs in error at the December term thereof, A. D. 1842, be and the same is hereby reversed, because rendered as a judgment in bar ; and this court, proceeding to render the judgment that should have been pronounced by the court below, doth order and adjudge, that the plaintiffs in error, the plaintiffs in the court below, take nothing by their writ, and that the suit be abated."

To review this judgment, a writ of error brought the case up to this court.

BALDWIN, VAIL, AND HUFTY, v. JAMES PAYNE AND OTHERS.

Matthias W. Baldwin, George Vail, and George W. Hufty, copartners, brought this action on the 15th April, 1841, in the

Circuit Court of Jefferson county, Mississippi, against James Payne, Abner E. Green, and Robert Y. Wood, the makers, and the Mississippi Railroad Company, the indorsers, of two certain promissory notes, each in the sum of $ 6,283.95, payable at the Merchants' Bank, New Orleans, the first, sixty days after December 4, 1839, and the other ninety days thereafter. The notes were without date on their face, and were discounted, at the instance of Payne, one of the makers, by the Mississippi Railroad Company, under their banking powers, on the said 4th December, 1839, to whose order they were made payable, and were by said company, on the 1st day of April, 1841, indorsed over, transferred, and delivered to the plaintiffs, for a valuable consideration.

The defendants, Payne, Green, and Wood, were served with process, and appeared and pleaded the general issue. They also pleaded the following special plea, viz. : — " That the said promissory notes, in the declaration of the said plaintiffs mentioned, were executed and delivered by them, the said defendants, to, and discounted by, the Mississippi Railroad Company, on the 4th day of December, in the year 1839, at the county aforesaid, and thereby became and were the property of the said Mississippi Railroad Company, to wit, on the day and year aforesaid, at the county aforesaid ; and that the said promissory notes continued to be and were the property of the Mississippi Railroad Company from the day and year last aforesaid until and after the 26th day of April, in the year 1840, at the county aforesaid ; after which 26th day of April, in the year 1840, to wit, on the 1st day of April, in the year 1841, at the county aforesaid, the said Mississippi Railroad Company, by their indorsement thereon, transferred the said two promissory notes, in the said declaration mentioned, to the said plaintiffs ; and this they are ready to verify. Wherefore they pray judgment, if the said plaintiffs ought to have or maintain their aforesaid action thereof against them."

To this special plea the plaintiffs demurred, and the defendants joined in demurrer.

The Circuit Court, on the 11th of November, 1842, sustained the demurrer, and awarded judgment of *respondant ouster*, but the defendants refusing further to plead, the court thereupon gave judgment upon said demurrer to the second plea for the plaintiffs.

On the same day, the cause, being dismissed as to the Mississippi Railroad Company, came on for trial before a jury, on the general issue, against the other defendants ; and a special verdict was found, as follows, viz. : — " We, the jury, find that defendants, James Payne, Abner E. Green, and Robert Y. Wood,

26 *

executed the two several promissory notes (described in the plaintiffs' declaration) on the 4th day of December, 1839, and on the same day delivered the said notes to the Mississippi Railroad Company, to be discounted for and on account of said James Payne; one of which said notes is for the sum of $ 6,283.95, payable sixty days after the said 4th of December, 1839, to the order of the said Mississippi Railroad Company, at the Merchants' Bank in the city of New Orleans; and the other of the said notes is for the sum of $ 6,283.95, also payable ninety days after the said 4th of December, 1839, to the order of the said Mississippi Railroad Company, at the Merchants' Bank in the city of New Orleans. That said two notes were discounted by said Mississippi Railroad Company, under their banking powers, on the said 4th day of December, 1839, at the instance of the first drawer, said James Payne, and the proceeds thereof were received by him, and the said company thereby became the holder of said notes. That the said notes, or either of them, were not paid at maturity, and were presented for payment at maturity, and protested for non-payment, and that no part of them, nor any interest, has been paid by said defendants, or either of them. That the Mississippi Railroad Company, on the 1st day of April, 1841, being indebted to the plaintiffs, Baldwin, Vail, and Hufty, transferred and delivered said two several promissory notes to said plaintiffs, for a valuable consideration, in payment of said debts. If, upon the facts, the court is of opinion that the law is in favor of the plaintiffs, we find for the plaintiffs, and assess their damages at $ 15,300.90. But if, upon these facts, the court is of opinion that the law is for the defendants, Payne, Green, and Wood, then we find in their favor."

The Circuit Court gave judgment, upon this special verdict, in favor of the plaintiffs; and the defendants thereupon took a writ of error to the High Court of Errors and Appeals. The cause was argued in the Court of Errors, and on the 11th day of November, 1844, the said court rendered their final judgment, viz.: — "That the judgment of the Circuit Court of Jefferson county be reversed and for nothing held, and that the defendants in error, the plaintiffs below, take nothing by their writ, and that the suit is abated."

The charter of the Mississippi Railroad Company was conferred by an act of the legislature of Mississippi, approved February 26th, 1836, entitled "An act to incorporate the Mississippi Railroad Company." By the first section of a supplementary act, passed May 12th, 1837, the company were "authorized and empowered to exercise all the usual rights, powers, and privileges of banking which are permitted to banking

Planters' Bank *v.* Sharp et al.

institutions within this State, subject to the limitations and restrictions hereinafter mentioned." And by section eighth of said supplementary act, the company were, among other things, made capable " to purchase and sell real and personal estate, and to hold and enjoy the same to any amount not exceeding in value at any time $ 500,000 over and above the property in and necessarily connected with said railroad." By the same section, its " banking privileges, rights, and powers were secured to said company until the 30th day of December, 1858."

The Planters' Bank of the State of Mississippi was an incorporated banking institution, existing within said State at the date of the foregoing charter.

From the above statement of these two cases, it is apparent that in the first one, viz. that of the Planters' Bank, the suit was in the name of the original payees of the note, and in the second, it was in the name of the indorsees, being brought in both cases against the makers of the notes. The main question in both was the constitutionality of the statute of Mississippi passed on the 21st of February, 1840.

The two cases were argued, as has already been remarked, together, by *Mr. Wharton* and *Mr. Sergeant,* for the plaintiffs in error, and by *Mr. Coleman, Mr. Gilpin,* and *Mr. Webster,* for the defendants in error.

The counsel for the plaintiffs in error made the following points in the case of the Planters' Bank.

1. That by the final judgment of the High Court of Errors and Appeals of Mississippi in this suit, there was drawn in question the validity of the act of that State of the 21st day of February, 1840, on the ground of its being repugnant to the Constitution of the United States, and that the decision was in favor of the validity of the act.

2. That by said judgment in this suit, there was drawn in question the construction of the tenth section of the first article of the said Constitution, which declares that " no State shall pass a law impairing the obligation of contracts," and the decision was against the title and right specially set up and claimed by the plaintiffs in error, under such clause of the Constitution.

3. That the charter and supplemental charter of the Mississippi Railroad Company is a contract, within the meaning of the Constitution, between the people of the State of Mississippi, and the stockholders of the corporation and all claiming under the charter.

4. That the said charter authorizes the bank to transfer

notes, bills receivable, and other evidences of debt, belonging to it, and to destroy this right impairs the obligation of the aforesaid contract.

5. That the charter is an unqualified contract, and is all inviolable in point of obligation; and that the power to acquire and transfer its property aforesaid may, of right, be exercised with freedom from all restraints not contained in the charter, nor imposed by the law of Mississippi when the charter was granted; of which restraints there were none.

6. That the said law of Mississippi cuts off all suit in case of transfer, and is therefore unconstitutional.

7. That the said act is repugnant to the Constitution of the United States, unconstitutional, and void.

In the case of Baldwin, Vail, and Hufty, the following was an additional point.

That the plaintiffs in error were the holders of certain promissory notes put in suit by them, which they had purchased for value from a company that by its charter had the right to sell and transfer them, and that the judgment of the High Court of Errors and Appeals in favor of the defendants below, on the mere ground that the plaintiffs had possession of said notes by transfer from the Mississippi Railroad Company, impaired both the obligation of the contract between the State and the company, and that between the makers of said notes and the holders.

*Mr. Wharton,* for the plaintiffs in error, stated the circumstances of each case and the difference between them. The point was the same in both, viz. the right to transfer the notes, and the validity of the statute which forbid it. In the case of the Planters' Bank the judgment of the State court was, that the statute not only disabled the bank from transferring, but also that the bank itself had lost the right to sue, in consequence of such a transfer having been made whilst the suit was pending. The suit in this case was in the name of the original payees. In the other case the suit was brought by the indorsees. The transfer was pleaded as a defence, and the court sustained it. Therefore the judgment of the State court was, in the two cases, that neither the payee nor indorsee could maintain an action where a transfer had been made. We say that this decision is contrary to the Constitution of the United States. The principles upon which we stand are elementary. The State law was passed in 1840, after the grant of the charter and after the execution of the notes.

(*Mr. Wharton* then entered into a history of the decisions of this and other courts upon the following propositions.)

1st. That a charter is a contract between a State and the corporation. 6 Cranch, 87, decided in 1810. A grant is an executed contract, and a repeal of the law cannot set it aside. 9 Cranch, 43, in 1815.

A legislative grant is not revocable. 4 Wheat. 518, in 1819; 1 Greenleaf, 79, in 1820.

A statute granting corporate powers, when accepted, becomes a contract. 15 Mass. 245, in 1819; 8 Wheat. 464, in 1823; 10 Conn. 522, in 1835.

2d. A bank charter is as much a contract as any other charter. This precise point has not often been made. The right of a State to incorporate a bank has been made a question in one case only; viz. Peck, 269; Minor, Alab. R. 23, in 1820; 2 Stuart, Alab. R. 30, in 1829.

In both the last cases the court say that a bank charter is a contract between the State and stockholders, and cannot be changed unless with the assent of both parties. 4 Peters, 514, in 1830, where the tax was held constitutional, but the court say that the contract with the bank must be protected. See p. 560. 3 Wendell, 351, in 1832; 11 Peters, 257, in 1837.

A bank owned wholly by a State is constitutional. 9 Wheat. 407, in 1824.

Such a contract is protected by the Constitution. 3 Howard, 133.

3d. No State can pass a law impairing the obligation of a bank charter. This is a corollary from the other two propositions.

What, then, was the contract in these cases? The power to the Planters' Bank is given in words as comprehensive as possible. The only limitation is as to the amount of property to be held. The railroad charter refers to and adopts the bank charter. In both, there was a power to receive these notes, to hold them, and to alien or sell them. Before the restraining statute was passed, it would not have been easy to doubt these powers. The words, "grant, demise, alien, or dispose of," are as comprehensive as any words that could be used. "Goods, chattels, and effects" must include promissory notes. "Goods and chattels" would do so, but "effects" is still stronger. The legal meaning of "effects" is explained in Cowper, 299. Also 13 Vesey, 39, 47, note.

Corporations, unless restrained by their charter, have control over their property, and may alienate it. 1 Kyd on Corp. 108; 1 Sid. 161, cited by Kyd; Co. Litt. 44 a, 300 b; 10 Coke, Rep. 306; 2 Kent, Comm. 281 (4th ed.); 3 Pick. 239; 1 Ves. & Bea. 226, 337, 340, 344; 2 Bland, 142; 5 Hammond, 205; 5 Wend. 590; 1 Watts, 385; 6 Gill & Johns. 305;

11 Vermont, 385; 2 Stuart, 401; 2 Wheat. 372; 5 Watts & Serg. 223.

The next question is, What did the legislature do to impair these rights? It said that the suit should abate. It is true, there was no final judgment in bar, but the right of maintaining an action was cut off for ever. If both judgments of the State court are correct, then neither the original payee nor the transferee can sue. No one can sue. If the legislature had merely forbidden the transfer, and suffered the original right of property to remain in the bank, then the bank could have sued for the use of the transferee. But the court have said that the fact of transfer abates the suit brought in the name of the bank.

The legislature could not do this. 1 Murphy, 58, in 1805; 2 Haywood, 310, 374; 2 Mass. 142, 143, in 1806; 7 Cranch, 184, in 1812; 15 Mass. 447, in 1819; Peck, 1; 6 Wheat. 131; 6 Greenl. 112; 2 Penn. Rep. 184; 2 Yerger, 534; 7 Gill & Johns. 7, 134; 2 Fairfield, 118.

This court usually adopts the State construction of State laws. 10 Wheat. 152; 11 Wheat. 361; 3 Wash. C. C. R. 313.

If, then, this court adopts the Mississippi construction of this statute, all suits upon the notes are cut off; the contract is destroyed entirely. There is no difference between taking the whole or a part, if the obligation of the contract is impaired. What is the obligation of a contract? See 4 Wheat. 207, 197; 4 Littell, 34, 47; 12 Wheat. 318.

The Constitution refers to a legal, and not a moral obligation, and depriving the party of all remedy impairs the legal obligation. 8 Mass. 430; 2 Gallison, 141; 2 Greenl. 294; 3 Peters, 290; 8 Wheat. 17; 1 Howard, 316, 317; 2 ib. 608.

*Mr. Coleman*, for the defendants in error, laid down the following propositions: —

1. That the presumption is always in favor of the validity of a law; and that its invalidity or unconstitutionality must be *clearly demonstrated* by the party attacking it.

2. That corporate powers are to be strictly construed; and that corporations possess only such powers as are specifically granted them, or are necessary for the exercise of those expressly granted.

3. That neither by the charter of the Mississippi Railroad Company, nor by that of the Planters' Bank, nor by those of any of the other banks of Mississippi which were incorporated prior to the year 1837, has the power to transfer promissory notes been *expressly* given.

4. That the power to transfer promissory notes is not necessary to the exercise or enjoyment of any of the powers that have been expressly granted to said company.

5. That the transfer or negotiation of promissory notes is not a legitimate banking operation; but, on the contrary, is subversive of the very end and object for which these institutions are chartered.

6. That the seventh section of the act of 1840 is neither a partial law, nor does it divest vested rights; and that even were it liable to both these objections, they alone would not render it unconstitutional.

And as a conclusion necessarily flowing from the maintenance of the foregoing propositions, we hold, lastly,

That the seventh section of the act of 1840 neither directly nor incidentally impairs the obligation of any contract entered into by the State of Mississippi with the Mississippi Railroad Company, and is therefore a valid and constitutional law.

Upon the 1st point. 4 Dall. 19; 6 Cranch, 128. The propositions laid down by the counsel on the opposite side are not controverted. We admit all three; but say that the contract is not impaired.

Upon the 2d point. 4 Peters, 168; 2 Cranch, 167; 4 Wheat. 636; 15 Johns. 358; Angell & Ames, 192 (2d ed.) sec. 12; 2 Kent, 298, 299. Kent says that the modern doctrine is so. The cases cited on the other side are exploded.

3d point. If the argument upon the other side should be correct as to the Planters' Bank, it does not follow that it is so as to the railroad company, because only the usual banking powers are conferred upon the latter, and the power to transfer notes is not a usual banking power. The purposes and objects of the company could be attained without this power.

Moreover, to construe the word "effects" as including promissory notes will make two clauses of the charter inconsistent with each other. The capital was three millions, and the amount of notes issued was not to exceed three times the amount of capital paid in. Therefore the bank had a right to issue nine millions. But the sixth section limits the amount of property which it can hold to six millions. If notes are included within the "effects" of the bank, and it can hold only six millions, then the two sections are inconsistent with each other; and the only mode of reconciling them is to construe the words "property" and "effects" as exclusive of the banking capital. 3 Smedes & Marshall, 677, — this case; 8 Rob. La. Rep. 417, 420, — a construction of this same statute.

4th and 5th points. The power does not necessarily follow. If so, to what granted power is this implied one necessary? The bank may keep its notes till they are due, and then collect them. It does not necessarily belong to the *jus disponendi.* Neither is it necessary to the right of acquisition.

In the case of Baldwin, Vail, and Hufty, the notes were the property of the transferee. But no case decides, that, if the original party had recovered possession of the note, a suit could not be maintained upon it. In the case of the Planters' Bank, why did not the bank reply to the plea, that it had regained possession of the note ? This would have brought the question fairly up. The object of the legislature was not to destroy the note, but merely to repeal its negotiability, conferred first by the Statute of Anne, and afterwards by the legislature of Mississippi. How. & Hutch. 373, sec. 12.

The argument upon the other side would be sound, if by the charter the bank acquired an indefeasible right to transfer notes ; and it is said to be so because no existing statute then prohibited transfers. But the property of negotiability is not essential to a note. It was regulated by a general act of the legislature, and might with propriety have been repealed.

6th. —The objection that this law is partial, and relates only to banks, is not properly made here. This court has nothing to do with such a question. But the proposition is denied, that it is a partial law. 6 Cowen, 512, 169 ; 15 Wend. 436.

*Mr. Gilpin*, on the same side, said that the only question before the court was whether or not the law of Mississippi impaired the obligation of its contract with the bank. If it did, no court would be more ready to condemn it than the State court of Mississippi. In this very case that court say : — " Legislation which impairs chartered rights is not only at war with the Constitution of the United States, but it is repugnant to a similar provision in our State constitution, and on that account would be inoperative. But if both these instruments were silent as to the power to impair the obligations of contracts, such legislation is essentially repugnant to the protective spirit of a well-organized government. In a government like ours, such power is totally out of the range of legislative authority," &c., &c.

No State goes further to uphold this clause of the Constitution than Mississippi. 1 Howard, Miss. Rep. 189 ; 6 ib. 672 ; 4 Smedes & Marshall, 507.

Does the law in question impair the obligation of a contract ? It only modifies the previous law relating to the assignment of debts or property, bearing only on assignments which took place after the passage of the law ; it protects the debtor by saying that he shall not be exposed to different liabilities than those which he took upon himself ; it adheres to the original contract ; it leaves parties in the same situation where they placed themselves ; it changed no obligation, but only forbade

Planters' Bank *v.* Sharp et al.

the transfer of that obligation to any one else. All that it took from a promissory note was the benefit of a statutory regulation. The common law gave no right to transfer such property. According to Coke, choses in action were not assignable. The right exists only by the Statute of Anne, and courts have always confined the privilege to the letter of the law. 5 Peters, 597 ; 16 Mass. Rep. 452 ; 14 ib. 108.

. The statute of Mississippi, of 1822, made notes transferable, and her courts recognize this as the only foundation of the right to transfer. 7 Howard, Miss. Rep. 391 ; 2 Smedes & Marshall, 249.

With this public statute existing, the Planters' Bank was chartered. It was to perform banking operations, and nothing else.

The sixth section enumerates its powers, and, if the right to transfer exists, it must be found here.

The seventeenth prescribes its banking duties, — to "receive money," &c. ; not a word about the transfer of notes.

. The twentieth says it may issue bank-notes.

The twenty-second limits its issue to three times the amount of capital paid in and deposits.

The thirty-first says it may sell securities, when they are mortgages. In all this, there is no right to transfer.

There is a distinction, all through the charter and the supplement, between corporate powers and banking powers. The first are only given to enable it to execute the latter.

But if the argument upon the other side be sound, the bank could do any thing. Under the general head of acquiring property, it might make a railroad.

The railroad company had less power than the bank. Its duties are specifically pointed out, and it is authorized to purchase and sell bills of exchange, but not a word about notes.

In 1840 (Pamphlet Laws, 13, 21), the legislature passed laws to remedy the evils of banks, to limit their issues, forbid dealing in cotton, stocks, &c. Are these all violations of the charter ? In 1843, the legislature appointed commissioners to take charge of the assets of banks. The object of the law of 1840 was to give notice that notes were not transferable, but that the obligors should be protected. The assignee, therefore, took these notes knowingly. But the assignee of a bond cannot sue upon it after receiving notice that it is not to be transferred. Another object of the legislature was to compel the banks to receive their own depreciated paper in payment of debts. The borrowers had received this paper, and an assignment would cut off the right of set-off. The policy of all these laws will be defeated if the statute is overthrown.

The following have been adopted as principles in construing State laws : —

1st. The presumption is in favor of a State law.   1 Dall. 14.

2d. A contract between a bank and a State must be construed strictly. 2 Cranch, 167 ; Osborn *v.* Bank of United States, 9 Wheat. 738 ; 13 Peters, 587 ; 15 Johns. 383 ; 2 Cowen, 700.

In the case before us, we are dealing with the contract between the bank and State, not that between the parties to the note.   If it were the latter, the rule is, that a party taking a note after it is due takes it *cum onere.*   4 Dall. 370 ; 13 Peters, 65.

The railroad company had no power to transfer vested in it by the charter.   If it had the right at all, it must be found in the charter as an express grant, or it must have been held by the municipal law, which is always subject to be repealed.

As to the first branch.   If granted in the charter, it must be found in the words " usual powers of banking."   Does this clause include a power to sell ?   Even if the Planters' Bank had it specially, it would not pass to the railroad company under this general clause.   In other States, the power to sell is not considered one of the usual banking powers.   1 Rev. Stat. N. Y. 178, sec. 6 ; 9 Mass. Rep. 54 ; 2 Cowen, 710.

What is the doctrine of this court, as expressed in the cases which have been decided ?   There are only thirteen where laws have been held unconstitutional, and not one of them is like the present.

(*Mr. Gilpin* here went through a critical examination of all the cases referred to by the opening counsel.)

*Mr. Webster*, on the same side, referred to all the laws of the State relating to the case, and also to a Territorial act passed in 1812, and afterwards adopted by the State.   This made bonds and notes assignable, whether drawn to order or not, but made the assignee liable to all equity occurring before notice of assignment.

Bills of exchange were exempted from the operation of the law of 1840.   Why ?   Because the sale of them is expressly granted in the seventh section of the supplemental act.   Selling them might be one of the mischiefs intended to be guarded against.   But the legislature found the power within the charter, and therefore did not attempt to interfere with it.

In the case of the railroad notes, there was a special verdict. The counsel on the opposite side complain of it as a case of hardship.   But how is it made out ?   In December, 1839, two notes were given, one payable in 60, and the other in 90 days.

They were discounted on the same day. Neither was paid. They were protested, and remained so for more than a year. The bank then stopped payment itself. On the 1st of April, 1841, the bank indorsed these notes to the plaintiffs in error. So the jury find. But there is no purchase stated, no money paid. They were transferred to pay a previously existing debt. If the plaintiffs lose this suit, therefore, they are no worse off than they were before. They took the notes to see what they could make out of them, with the law staring them in the face. There is no hardship in the case.

The charter of the railroad company gave all necessary powers. If a case could be shown where it was necessary to sell notes, then the transaction would be within the charter. But it is difficult to make out such a case. The incidental powers of a corporation only reach and include what is necessary. 2 Kent, 298 (4th ed.); Angell & Ames, 195 (2d ed.), chap. 5, sec. 2, and the cases there cited.

The amendatory act must be construed by the same rule. The power must be given by express grant, or it must be essential to the proper exercise of some granted power.

1. As to an express grant. There is none such found; on the contary, it is excluded by the clearest indications of the act.

2. It is not essential. On the contrary, the exercise of it would be dangerous and subversive of the grant.

It has been said, that the express power is in the first and eighth sections of the amendatory act; that the "usual powers of banking" refer to the Planters' Bank, and that the word "effects" includes promissory notes, and the words "dispose of" are equivalent to "transfer." But the court of Mississippi did not think so. The declaration says the notes were "indorsed" to the plaintiffs. The words of the law are, that they shall not be "transferred." These two things are not identical. An indorsement is a new contract. The indorser parts with the paper and makes himself liable.

But the seventh section is still stronger. It says that they may "negotiate checks, drafts, and bills of exchange." If promissory notes were intended to be included, here was the place to put them in.

If the sixth section included every thing, why insert this at all? The seventeenth section says, "may discount bills of exchange and notes," "may renew notes." This supposes that the notes are lying in the bank, or they cannot be renewed. The twenty-second section says that all notes must be payable at the bank. This also infers that they must be there at all times.

The limitation of the power to issue would be effectually destroyed if the bank could sell and indorse notes, because there is no limit to such a proceeding. It is true, that the liability is contingent; but still it has ruined many corporations.

Is the power to transfer notes essential to the proper business of banking? On the contrary, it is entirely subversive of it. It is indorsing other people's paper, — mere brokerage. When the paper is assigned, interest upon it ceases to the bank. No well-conducted bank is ever reduced to such an emergency as to be obliged to sell paper.

(*Mr. Webster* illustrated this by a reference to 3 Anderson's History of Commerce, 143, for a history of the Bank of England, and then examined the decisions of this court which were alleged to be hostile to the positions which he had assumed.)

*Mr. Sergeant,* for plaintiffs in error, in reply and conclusion, spoke first of the merits of the cases. The makers of the notes had been represented to be willing to pay in the depreciated notes of the bank. Why did they not? The note fell due and remained in the bank for a long time, during which they could have paid in the notes of the bank. But they were now seeking to avoid the payment of a just debt by setting up the policy of the State. We ask for the benefit of the Constitution of the United States, which is paramount to Mississippi laws. The principles of this court are now adopted by the courts of the States, and it is a mistake to say that they are not acceptable to the people. The States say, pass the law, and if it is wrong the Supreme Court will overthrow it. If in these cases we ask, Did you not make these notes? the answer must be, Yes. Did you not promise to pay? Yes. Have you any defence but the one now set up, viz. the policy of the State? No. But if a whole community are set free from paying their debts, it is a policy which no one ought to wish to establish. This is a far-fetched defence. The defendants have reconciled their own consciences to it, but they are under the influence of self-interest. The aggregate of claims involved is two millions of dollars, every one of which is as just as this one. The Planters' Bank was chartered in 1830. Afterwards there were four more, the last in 1837. All these banks had an extensive capital, but the Planters' Bank was the favorite of the State. It was visible and felt everywhere. A mighty machine was set up, and its accounts have now to be settled with the people of the United States. Then came the railroad company, which commenced as such, and was afterwards vested with banking powers. The object of the supplementary charter was to add to, and not diminish, its powers. It conferred the powers

"usual for banking purposes," "authority to deal in bills of exchange." It has been said that this excludes "notes." But by a fair construction it includes them; because it says, also, "checks, bills," &c., and then gives the same power over these checks, &c., referring to notes. There is no sense in the section upon any other construction. They have had a whirlwind in Mississippi, but they sowed the wind. The notes were given in 1839. Then every thing was right enough. The bank could not collect them, because the debtors would not pay. What was the bank to do? Keep them in its drawer, and suffer its own creditors to remain unpaid? Keep its harvest locked up in the barn, and not give one sheaf to its creditors? There was no use in keeping the notes. They were given for a real consideration, and when suit was brought, there was no pretence of any defence. The record shows that there was none. There was no usury connected with them, and they were negotiable on their face. The result of the two suits together shows that all remedy by suit is lost. This court, in Bronson *v.* Kinzie, said that no additional burden should be put upon the creditor; but here his remedy is entirely gone.

The statute says that the bank shall not transfer any "note, bill receivable, or other evidence of debt." But it cannot pass these things to its creditor without transferring them, nor can it make a general assignment to trustees without transferring its choses in action. The laws of Mississippi do not prohibit debtors from giving preferences.

This act is retrospective. It acts upon existing contracts. But this is in opposition to the judgment of this court in the case of Bronson *v.* Kinzie. The opinion of learned and unlearned men would concur in this. We need only take the notes and the statute, and present the case to any mind. The answer must be, that the claimants are now without remedy, and that they are so in consequence of the law of 1840. Up to the time of assignment, the plaintiff was justly a creditor. Now, his claim is extinguished for ever.

The object of the statute has been stated to be, to compel the banks to pay specie. But how can they do this, when they are prohibited from selling the things which will bring them specie? The charter required the bank to take paper which was "payable and negotiable at the bank." How negotiable? The law merchant describes this quality as passing from hand to hand by indorsement and delivery. The object must have been to give the bank the best kind of paper, such as it could use in an emergency by selling. It has been said that the word "enjoy," in the charter, does not imply the

27 *

power of selling property; but how can a hungry man enjoy a dollar in his pocket without spending it?

It is an error to say that notes were not negotiable at common law. There never was a time in England when they were not so. The Statute of Anne only enabled the transferee to sue in his own name.

The State might as well have said that all bonds, mortgages, notes, &c., should be at once void, as to have declared this one so. If the legislature intended to protect debtors, the system of ethics has become inverted. Hitherto it has been thought to be the duty of a legislature to take care of creditors also.

They do not profess here to act only upon the remedy. They root up the contract. Before the act of 1840, the bank had these notes in hand, and they were negotiable. The act stopped their negotiability. It has been said that there is no authority in the charter to negotiate notes. Why? Because the legislature knew that all individuals had the right, and where a corporation was created, it would necessarily have it also. One great duty of a corporation is to pay its debts. Will it be said on the other side, that it cannot do so unless expressly authorized in its charter? Under what law can it make a general assignment? A corporation has no faculty to do wrong. If it can use any other species of property to pay its debts, much more can it use that kind which is most readily applicable, most convenient, and most proper, namely, its own evidences of debt.

Mr. Justice WOODBURY delivered the opinion of the court.

### PLANTERS' BANK *v.* SHARP ET AL.

The question to be considered in this case is, whether an act of the legislature of Mississippi, passed February 21st, 1840, impaired *the obligation of any contract* which the State or others had previously entered into with the Planters' Bank.

If it did, the clause in the Constitution of the United States, expressly prohibiting a State from passing any such law, has been violated, and the plaintiffs in error are entitled to judgment.

But, on the contrary, if that act does not impair the obligation of any contract, the judgment below in favor of the defendants must be affirmed.

In considering this question, no peculiar liberality of construction in favor of a corporation, so as to render that an encroachment on its rights which is not clearly so, seems to be demanded of us by any more sacredness in the character of a

corporation or its rights than in that of an individual; but rather, that its charter as a public grant is not to be construed beyond its natural import. 8 Peters, 738; 3 Peters, 289; 4 Peters, 168, 514. The inviolability of contracts, however, and the faithful protection of vested rights, are due to the one no less than the other, and are both involved in the present inquiry, so far as affecting, by way of principle or precedent, all the various and vast interests of this kind existing over the whole Union.

Mr. Madison denounced laws impairing the obligation of contracts as among those not only violating the Constitution, but " *contrary to the first principles of the social compact and to every principle of sound legislation.*" (Federalist, No. 44.)

Again, in Payne et al. *v.* Baldwin et al., 3 Smedes & Marshall, 677, one of the cases now before us, it is truly admitted, that, " in a government like ours, such power is totally out of the range of legislative authority."

At the same time, it is to be recollected that our legislatures stand in a position demanding often the most favorable construction for their motives in passing laws, and they require a fair rather than hypercritical view of well-intended provisions in them. Those public bodies must be presumed to act from public considerations, being in a high public trust; and when their measures relate to matters of general interest, and can be vindicated under express or justly implied powers, and more especially when they appear intended for improvements, made in the true spirit of the age, or for salutary reforms in abuses, the disposition in the judiciary should be strong to uphold them.

Certainly it will be only when they depart from limitations or qualifications of this character, and so use their own rights as to impair the prior rights of others, that a check must be used, however unpleasant to us, by declaring, that the constitutional restrictions of the general government must control a statute of a State conflicting with them, and thus, for harmony and uniformity, make the former supreme, in compliance with the injunctions imposed by the people and the States themselves in the Constitution. Governed by such views, we proceed to the examination of the questions arising here, by ascertaining, first, what powers the legislature of Mississippi granted to the plaintiffs, and then what powers it has taken away from them.

On the 10th of February, 1830, " An act to establish a Planters' Bank in the State of Mississippi " passed, and, among other privileges, in the sixth section, granted that the bank " shall be capable and able, in law, to have, possess, receive, retain, and enjoy, to themselves and their successors, lands,

rents, tenements, hereditaments, goods, chattels, and effects, of what kind soever, nature, and quality, not exceeding in the whole six millions of dollars, including the capital stock of said bank, and the same to grant, demise, alien, or dispose of, for the good of said bank."

The seventeenth section gives power, also, " to receive money on deposit, and pay away the same free of expense, discount bills of exchange and notes, with two or more good and sufficient names thereon, or secured by a deposit of bank or other public stock, and to make loans to citizens of the States in the nature of discount on real property, secured by mortgage," &c.

Doing business with these powers, amounting, as it has been repeatedly settled, to a contract in the charter for the use of them (see cases in the West River Bridge, at this term), the bank, on the 24th of May, 1839, took the promissory note on which the present suit was instituted, and, on the 10th day of June, 1842, transferred it to the United States Bank, having first commenced this action on it, the 11th of October, 1841.

But in the mean time, after the execution of the note, though before its transfer, the legislature of Mississippi, on the 21st day of February, 1840, passed a law, the seventh section of which is in these words : — " It shall not be lawful for any bank in this State to transfer by indorsement or otherwise any note, bill receivable, or other evidence of debt ; and if it shall appear in evidence, upon the trial of any action upon any such note, bill receivable, or other evidence of debt, that the same was transferred, the same shall abate upon the plea of the defendant." (See Acts of 1840, p. 15.) This law constitutes the only defence to a recovery in the present case by the plaintiffs. But they contend it is invalid, because, by the Constitution, art. 1, § 10, " no State ". shall pass any law " impairing the obligation of contracts " ; and this law does impair it, in this instance, in two respects. First, in the obligation of the contract in the charter with the State ; and secondly, in the obligation of the contract made by the signers of the note declared on with the bank.

To decide understandingly these questions, it will be necessary to go a little further into the true extent of those two contracts under the powers held by the bank, and likewise into the true extent of the subsequent act of the legislature affecting them.

That promissory notes are to be regarded as either goods, chattels, or effects, within the sixth section of the charter, can hardly be questioned, when it includes these " of what kind soever, nature, and quality." This addition evidently meant to remove any doubt or restriction as to the meaning of those

terms, as sometimes employed in connection with peculiar sub-jects, and to extend the description by them to every kind of personal property belonging to the bank.   This construction would go no further than sometimes has been done in England, holding the words *goods and chattels* to include choses in action, as well as other personal property (12 Coke, 1 ; 1 Atkins, 1182), and by the word *goods* alone, in a bequest, it has been held that a bond will pass (Anonymous, 1 P. Wms. 127).

So, in respect to *effects*, it has been held, when the word is used alone, or *simpliciter*, it means all kinds of personal estate. 13 Ves. 39, 47, note ; Michell *v.* Michell, 5 Madd. 72 ; Hearne *v.* Wigginton, 6 Madd. 119 ; Cowp. 299.   But if there be some word used with it, restraining its meaning, then it is governed by that, or means something *ejusdem generis*.   Here, however, instead of restraining terms being used with it, those most broad and enlarging are added, being " effects of what kind soever, nature, and quality."   Hotham *v.* Sutton, 15 Ves. 326 ; Campbell *v.* Prescott, 15 Ves. 500 ; 3 Ves. 212, note.

The same rule prevailed in the civil law, under the term *bona mobilia.*   (1 P. Wms. 267.)   And by that law, as well as the common law, promissory notes or choses in action come under the category of movable goods or personal property, as they accompany the person.   2 Bl. Comm. 384, 398.

The bank was allowed, also, by the seventeenth section, " to discount bills of exchange and notes " ; and, in truth, promissory notes usually constitute a large portion of the property of such institutions.   Such notes, also, not only by general usage and established forms, are, in most cases, made to run to banks or their order, and must be expected to run so when the banks please ; but it is expressly provided, by the twenty-second section of this charter, that " it shall not be lawful for said bank to discount any note or notes which shall not be made payable and *negotiable* at said bank," &c.   And, again, by an amendatory act, accepted by the bank, it was provided, on the 9th of December, 1831, " that such promissory notes shall be made payable and *negotiable* on their face at some bank or branch bank."

But why made negotiable, if no right was to exist to negotiate or transfer them ?   The bank, then, as the legal holder of such notes, possessed a double right " to dispose " of them ; first, from the express grant in the charter itself, empowering them, as to their " goods, chattels, and effects, of what kind soever, nature, and quality," " the same to grant, demise, alien, or dispose of, for the good of said bank " (sixth section) ; secondly, by an implied authority, incident to its charter and business, and the express requirement that the notes should be

"negotiable on their face." We do not refer to the next ground because it is necessary to resort to implication or analogy to establish an authority in the bank under its charter to make a transfer of its notes, when it possesses that authority by the very words and spirit of the contract made in the charter by the State.

But to make the correctness of this conclusion from the specific words of the charter stronger and undoubted, it will be found to be the natural, useful, and proper view of its powers as a bank, under all sound analogy and necessarily implied authority.

To reach this end, it is not indispensable to hold that corporations in modern times possess numerous incidental powers, equal to those of individuals, as was once the doctrine (Kyd on Corp. 108; 2 Kent, Comm. 281, and cases in those treatises); but seems now in some respects overruled. Earle *v.* Bank of Augusta, 13 Peters, 519, 587, 153; 2 Cranch, 167; 12 Wheat. 64. But merely to hold, as it often has been in late years, that what is necessary and proper to be done to carry into effect express grants, and which is nowhere forbidden, may in most cases be lawful.

Though such a power as this last to Congress is expressly added in the Constitution of the United States, yet it has been considered by some that it would exist as a reasonable incident, under reasonable limitations, without any such express addition. 2 Kent, Comm. 298, and cases there cited.

Thus a corporation, if once organized, has the implied power to make contracts connected with its business and debts, and through agents and notes as well as under its seal. Bank of Columbia *v.* Patterson's Adm'r, 7 Cranch, 299; 8 Wheat. 338; 12 Wheat. 64; 11 Peters, 588.

So it may hold and dispose of property even in trust, if not inconsistent and unconnected with its express duties and objects. Vidal et al. *v.* Girard's Ex'rs, 2 Howard, 127.

Hence a power to dispose of its notes, as well as other property, may well be regarded as an incident to its business as a bank to *discount notes*, which are required to be in their terms assignable, as well as an incident to its right of holding them and other property, when no express limitation is imposed on the authority to transfer them.

Not that a banking corporation has under its charter a constructive power to follow another independent branch of business, such as manufacturing or foreign trade, but merely the business of banking, and to do such acts as are necessary and proper or usual to carry that business into effect, and such as are in harmony with the letter and spirit of its charter.

Nor even that it can adopt any course as an incident, and as necessary and proper, which is merely convenient, or which is expressly forbidden by the charter, or so forbidden by any previously existing laws in the State of a general character.

But in discounting notes and managing its property in legitimate banking business, it must be able to assign or sell those notes when necessary and proper, as, for instance, to procure more specie in an emergency, or return an unusual amount of deposits withdrawn, or pay large debts for a banking-house, and for any "goods and effects" connected with banking which it may properly own. It is its duty to pay in some way every debt. 6 Gill & Johns. 219. This court, in the United States *v.* Robertson, 5 Peters, 650, has expressly recognized the authority of a bank to give bonds and assignments to pay its deposit debtors. In that case, "the directors agree to pledge to the government of the United States the entire estate of the corporation as a security for the payment of the original principal of the claim," &c. (p. 648). And such a pledge or transfer was held there to be valid.

It is said, in opposition to this, Why should a bank be considered as able to incur debts? or why to do any business on credit, requiring sales of its notes or other property to discharge its liabilities? Such inquiries overlook the fact, that the chief business and design of most banks, their very vitality, is to incur debts as well as have credits. All their deposit certificates, or bank-book credits to individuals, are debts of the bank, and which it is a legitimate and appropriate part of its business as a bank to incur and to pay. The same may be said, also, of all its bank-notes, or bills, they being merely promises or debts of the bank, payable to their holders, and imperative on them to discharge. See Bank of Columbia *v.* Patterson's Adm'r, 7 Cranch, 307; 13 Peters, 593.

It may, to be sure, independent of justifications like these, not be customary for banks to dispose of their notes often. But in exigencies of indebtedness and other wants under pressures like those referred to, it may not only be permissible, but much wiser and safer to do it than to issue more of its own paper, too much of it being already out, or part with more of its specie on hand, too little being now possessed for meeting all its obligations. Indeed, its right to sell any of its property, when not restricted in the charter or any previous law, is perhaps as unlimited as that of an individual, if not carried into the transaction of another separate and unauthorized branch of business. (Angell & Ames on Corp., p. 104, § 9; 4 Johns. Ch. 307; 2 Kent, Comm. 283; 11 Serg. & Rawle, 411.) Both may sell notes to liquidate their debts, both sell their lands

acquired under mortgages foreclosed, or acquired under the extent of executions not redeemed. Both, too, must be able to sell all kinds of their property, when proceeding to close up their business, or find it impracticable. Nor is there any pretence here that any clause in the charter of this bank restricted it from selling its notes or other property under any circumstances, and much less under those, connected with indebtedness and with banking, which have just been referred to. It will be seen, in this way, that all analogies seem to sustain the right which exists by the express grant in this charter, to "*alien and dispose of*" all its "goods, chattels, and effects, of what kind soever, nature, and quality, for the good of said bank." But to avoid differences of opinion, we place the right here solely on the express grant. It ought, perhaps, to be added, that the courts of Mississippi once put a more limited construction on this charter. Baldwin et al. *v.* Payne et al., 3 Smedes & Marshall, 661.

But as that very case is now before us for revision, on the ground that it was erroneous, we feel obliged, for that and other reasons, which need not be here enumerated, to put such construction on the charter, and on the law supposed to violate it, as seems right according to our own views of their true intent.

Having thus ascertained the extent of the contract made by the State with the bank in the charter, we proceed next to examine the character and scope of the contract between the maker of the note and the bank.

We have already seen that the bank was not only authorized, but expressly required, to discount notes which were negotiable, or, in other words, which contained a contract or stipulation to pay them to any assignee. Nor is it pretended there was any law of Mississippi, when this charter was given or when this note was taken, which prohibited selling it, and passing to an assignee all the rights, either of property or of bringing a suit in his own name, which then existed with individuals and other banking institutions.

What law existed on this point when the note was actually transferred is not the inquiry, but what existed when it was made, and its obligations as a contract were fixed. The law which existed at the transfer, so far from being the test of the force of a contract made long before, and under different legal provisions, is the violation of it, and the very ground of complaint in the present proceeding.

This contract, then, by the bank with the maker, when executed, enabled the former to sell or assign it, and the indorsee to collect it, not only by its express terms, but by the general law of the State, then allowing transfers of negotiable paper

and suits in the name of indorsees.    Howard and Hutchinson's Laws, 373.

Indeed, independent of the last circumstance, it is highly probable, that, by the principles of the law of contracts and commercial paper, such choses in action may be legally assigned or transferred everywhere, when not expressly prohibited by statute.    This was done before the Statute of Anne, in England. And it is done since, as to paper both negotiable and not negotiable, independent of that statute.

If such notes cannot be sued in the name of the indorsee, when running to order, without the help of a statute, they certainly can be sued in the name of the payee, for the benefit of the indorsee, when the transfer is legal in its consideration and form.

The State itself, by passing this law prohibiting the transfer of notes by banks, recognizes the previous right, as well as custom, to transfer them; otherwise, the law would not be necessary to prevent it.    Nor is this law supposed to have been founded on any prior abuse of power in negotiating or selling its notes, which, if existing, might obviate the above inference. But it is understood, from the record and opinions of the State court, that the design of the law was to secure another provision of statute not previously existing, but made by the legislature at the same time, requiring banks to receive their own notes in payment of their debtors, though below par.    That design, too, would still recognize the prior authority to sell or transfer.

We are not prepared to say that a State, under its general legislative powers, by which all rights of property are held and modified as the public interest may seem to demand, might not, where unrestricted by constitutions or its own contracts, pass statutes prohibiting all sales of certain kinds of property, or all sales by certain classes of persons or corporations.    14 Peters, 74.    Such has often been the legislation as to property held in mortmain or by aliens or certain proscribed sects in religion.

This is, however, very invidious legislation, when applied to classes or to particular kinds of property before allowed to be held generally.    Legislation for particular cases or contracts, without the consent of all concerned, is of very doubtful validity.    Merrill v. Sherburne et al., 1 New Hamp. 199.    Under our system of government, and the abuses to which in various ways and to various extents that kind of legislation might lead, several of the State constitutions possess clauses prohibitory of such a course where it affects contracts or vested rights, and more especially does the Constitution of the United States expressly forbid any such legislation, whenever it goes to im-

pair the obligation of a contract. · Hence, the general powers which still exist under other governments, or might once have prevailed here in the States, to change the tenure and rights over property, and especially the *jus disponendi* of it, cannot now, under the Federal Constitution, be exercised by our States to an extent affecting the obligation of contracts.

The next and final question, then, is, Did the act in question impair the obligation, either of the contract by the State with the bank, or of the contract by the maker of the note with the bank?

We have already ascertained the true extent of both of these contracts before this act passed; that by the State with the bank clearly allowing it to take negotiable notes, and to sell or transfer them, and that with the maker clearly enabling the bank to assign his note, and a recovery to be had on it after a transfer, by the assignee. In this condition of things, with this note taken and held, accompanied by such rights and obligations, the legislature of Mississippi passed the law already quoted, and now under consideration. It expressly took away the right of the bank to make any transfer whatever of its notes, and virtually deprived an assignee of them of the right to sustain any suit, either in his own name or that of the bank, to recover them of the maker.

·The new law, also, conferred in substance on the maker a new right to defeat any action so brought, which he would otherwise have been liable to. These results vitally changed the obligation of the contract between him and the bank, to pay to any assignee of it, as well as changed the obligation of the other contract between the State and the bank in the charter, to allow such notes to be taken and transferred. It is true that this new law might bear a construction, that the transfer was only a voidable act, and not void, and that, if cancelled or waived, a recovery might afterwards be had on the note by the bank; and this seems to have been the view of some of the court in 3 Smedes & Marshall, 681, as well as in Hyde et al. v. The Planters' Bank, 8 Robinson, 421. Yet the State court in Mississippi appears finally to have thought it meant otherwise, and to have decided that no suit at all can be sustained on such a note by any body after a transfer. This was the view which they think influenced the legislature. See Planters' Bank v. Sharp et al., 4 Smedes & Marshall, 28. We are disposed to acquiesce in the correctness of this construction, as it seems to conform nearest to the real designs of the legislature. But this view is not adopted, because a decision by a State court on a State statute, though generally governing us, is to control here in the very cases which, on account of that decision, are brought here by appeal or writ of error.

The rights of a party under a contract might improperly be narrowed or denied by a State court, without any redress, if their decision on the extent of them cannot be reviewed and overruled here in cases of this kind; while their decision, if restricting or enlarging the prohibitory act, might more safely stand, as doing no injury in the end, if we hold the act null wherever it is construed by them or us so as to conflict with prior rights obtained under contracts. See Commercial Bank v. Buckingham's Ex'rs, 5 Howard, 317.

If the State courts of Mississippi should hereafter adopt the dissenting opinion of Judge Sharkey, in 4 Smedes & Marshall, 28, and go back to what they appear to have before held, in 3 Smedes & Marshall, 661, — namely, that the right to sue by the bank, after a transfer, was not taken away, if the plaintiff replied that the transfer had been rescinded, and the interest was now solely in the bank, — and should that construction be adopted here, the force of this new law, as impairing the obligation of the contract, might not be so extensive and clear as now. But still it would seem to impair the contract in some respects; yet whether in such way and extent as to render the obligation itself changed must be left to be decided definitively when such a case is presented for our decision. In the present instance, however, as before explained, the extent and operation of the prohibitory law being regarded as forbidding any transfer whatever, and, if it takes place, as barring every kind of remedy on the note, the decisive question may be repeated, How can this happen without injury to the plaintiff's contracts? When every form of redress on a contract is taken away, it will be difficult to see how the obligation of it is not impaired. Green v. Biddle, 8 Wheat. 76; 1 Howard, 317; 4 Smedes & Marshall, 507; King v. Dedham Bank, 15 Mass. 447.

If any right or power be left, under the note, by this act, after a transfer is made, it is of no use, when it cannot be enforced and no benefit be derived from it, but an action abated *toties quoties* as often as it is instituted. 8 Wheat. 12; 1 Bl. Comm. 55. In the mildest view, a new disability is thus attached to an old contract, and its value and usefulness restricted; and these of course impair it. Society for Propagating the Gospel v. Wheeler, 2 Gall. 139.

One of the tests that a contract has been impaired is, that its value has by legislation been diminished. It is not, by the Constitution, to be impaired at all. This is not a question of degree or manner or cause, but of encroaching in any respect on its obligation, dispensing with any part of its force. The Commercial Bank of Rodney v. The State of Mississippi, 4 Smedes & Marshall, 507. So, if the obligation of a contract is to be re-

garded as the duty imposed by it, here the duty imposed by
the State to adhere to its own deliberate grant, and the duty
imposed on the signer of the note to make payment to an as-
signee, as well as to the bank itself, are both interfered with
and altered.

In answer to this supposed violation of the contract between
the maker of the note and the bank, some objections have
been urged which deserve further notice here.

It is sometimes stated, with plausibility, that States may
pass insolvent laws, suspending or taking away actions on con-
tracts, where the debtor goes into insolvency, and hence, by
analogy, can do it here. But there another remedy is still
given on the contract, before the commissioners of insolvency,
and a payment is made *pro rata*, as far as means exist. Here
there is no other remedy given, or any part payment made.
Indeed, it seems that a forfeiture of all right to recover on the
note, in any way, is inflicted here as a penalty for making that
very transfer which the bank before, by the act of incorpora-
tion, as well as by the note itself, was authorized to make.
Again, State insolvent laws, if made, like this law, to apply to
past contracts and stop suits on them, have been held not to
be constitutional except so far as they discharge the person
from imprisonment, or in some other way affect only the rem-
edy. When so restricted, they do not impair the obligation of
the contract itself, because the obligation is left in full force
and actionable, and future property, as well as present, subject-
ed to its payment, and the body exonerated only as a matter
connected merely with the form of the remedy. Cook *v.* Mof-
fat, 5 Howard, 316, and cases there cited. The case in 8
Robinson, 421, appears also to have been one on a note exe-
cuted after the prohibitory law, and not, as here, before. But
where future acquisitions are attempted to be exonerated, and
the discharge extended to the debt or contract itself, if done
by the States, it must not, as here, apply to past contracts, or
it is held to impair their obligation. Ogden *v.* Saunders, 12
Wheaton, 213; Sturges *v.* Crowninshield, 4 Wheaton, 122; 6
Wheaton, 131; 2 Kent, Comm. 392; Bronson *v.* Kinzie, 1 How-
ard, 311; McCracken *v.* Hayward, 2 Howard, 608; 1 Cowen,
321; 16 Johns. 237; 1 Ohio, 236; Cook *v.* Moffat, 5 Howard,
308, 314. Congress alone can do this as to prior contracts, by
means of an express permission in the Constitution to pass
uniform laws on the subject of bankruptcy; and which laws,
when not restrained by any constitution or clause like this as
to States impairing contracts, may in that way be made to
reach past obligations.

The misfortune here is, that the legislature, if meaning

Planters' Bank *v.* Sharp et al.

merely to insure to bill-holders of the bank, when debtors, the privilege of paying in the bills of the bank (as is supposed, 4 Smedes & Marshall, 1, 90), have not said so, and no more, by providing that promissory notes, though assigned by banks, should still be open to set-offs by their debtors of any of their bills which they then held. This would have been equitable, and no more, probably, than they would be entitled to, on common law principles, if an assignee purchased, as here, after the promissory notes fell due, and perhaps with a knowledge of the existence of such a set-off.

Chief Justice Marshall, in The United States *v.* Robertson, 5 Peters, 659, says, independent of any statute, "every debtor may pay his creditor with the notes of that creditor. They are an equitable and legal tender." Equally just and reasonable would have been a declaratory law as to the allowance of such bills as a set-off, where an assignment had been made collusively between the parties with a view to prevent such a set-off. 8 Robinson, 421.

But instead of resorting to such measures, the legislature adopted a shorter and more sweeping mode of attaining the end of preventing assignments which might embarrass or defeat set-offs. They did it by cutting off all assignments whatever, and all remedies whatever upon them. And they accompanied this by another statute, enabling debtors of the bank who held its notes, when their debts fell due, to pay in them, or set them off, and even virtually authorized them to make payment in depreciated bills or notes afterwards bought up for that purpose, and thus to gain an undue advantage over set-offs by other debtors in other matters.

The act as to this last topic was passed the next day after the act prohibiting transfers. Mississippi Laws, 2 February, 1840, p. 21, sec. 2. It was in these words : — "All banks above alluded to, and all other banks in this State, shall at all times receive their respective notes at par in liquidation of their bills receivable and other claims due them." These two acts, though undoubtedly well meant, and designed to give an honest preference to bill-holders (see Sharkey's dissenting opinion) as to a paper currency which ought always to be kept on a par with specie, were unfortunately, in the laudable zeal to avert a great apprehended evil, passed, without sufficient consideration of the limitations of the powers imposed by the Constitution of the Union on the State legislatures, not to impair the obligation of existing contracts. Nor was it necessary to go so far to secure any legitimate results. Some other laws are referred to, which are upheld and which affect the whole community, and seem to violate some of the important incidents of contracts

28 *

SUPREME COURT.

between individuals, or between them and corporations. But it will usually be found that these are such laws only as relate to future contracts, or if to past ones, relate to modes of proceeding·in ·courts, to the form of remedy merely, to priority to some classes of creditors (5 Cranch, 298), to the kind of process (9 Peters, 319; 10 Wheat. 51), to the length of the statute of limitations (6 Wheat. 131; 2 Mason, 168; 3 Johns. Ch. 190; 4 Wheat. 200; 1 Howard, 315), to exempting the body from imprisonment (4 Wheat. 200), or tools and household goods from seizure (16 Johns. 244; 1 Howard, 15; 11 Martin, 730), or affecting some privilege attached to the person or territory (Story on Confl. of Laws, 339, &c.), and not to the terms or obligations of any part of the contract itself (Cook *v.* Moffat, 5 Howard, 295; Towne *v.* Smith, 1 Woodb. & Minot, 132; 7 Greenl. 337; 3 Burge on Col. & For. Law, 234, 1046).

And if, in professing to alter the remedy only, the duties and rights of a contract itself are changed or impaired, it comes just as much within the spirit of the constitutional prohibition. Bronson *v.* Kinzie et al., 1 Howard, 316; 2 Howard, 612; 2 Madison Papers, 1239, 1581.

Thus, if a remedy is taken away entirely, as here, or clogged " *by condition of any kind, the right of the owner may indeed subsist and be acknowledged, but it is impaired.*" Green *v.* Biddle, 8 Wheat. 75. And the test, as before suggested, is not the extent of the violation of the contract, but the fact, that in truth its obligation is lessened, in however small a particular, and not merely altering or regulating the remedy alone. 2 Howard, 612; 8 Wheat. 1.

Having, it is believed, assigned sufficient reasons to show that the obligation of both of these contracts was impaired, it is now proposed briefly to refer to a few precedents bearing on the correctness of this conclusion, chiefly in respect to the most important of the contracts, — that between the State and the bank. On an examination of the various decisions which have taken place in this court on the violation of the obligation of contracts, it will be found that this case does not come within the principle of any of those where the decision was, that the new laws were no violation ; but, on the contrary, is much like several where the decision annulled them as a clear violation. Thus, where a new law has taken the property of a corporation for highways under the right of eminent domain, which reaches all property, private or corporate, on a public necessity, and on making full compensation for it, and under an implied stipulation to be allowed to do it in all public grants and charters, no injury is committed not atoned for, nothing is done not allowed

by preëxisting laws or rights, and consequently no part of the obligation of the contract is impaired. See case of the West River Bridge, and authorities there cited, in 6 Howard, 507.

So, when the legislature afterwards tax the property of such corporations, in common with other property of like kind in the State, it is under an implied stipulation to that effect, and violates no part of the contract contained in the charter. Armstrong *v.* Treasurer of Athens County, 16 Peters, 281. See Providence Bank *v.* Billings, 4 Peters, 514; 11 Peters, 567; 4 Wheat. 699; 12 Mass. Rep. 252; 4 Gill & Johns. 132; 4 Durn. & East, 2; 5 Barn. & Ald. 157; 2 Railway Cases, 23.

So, when no clause existed in a charter for a bridge against authorizing other bridges near at suitable places, it is no violation of the terms or obligation of the contract to authorize another. Charles River Bridge *v.* The Warren Bridge et al., 11 Peters, 420.

Nor is it, if a law make deeds by femes covert good when *bonâ fide*, though not acknowledged in a particular form; because it confirms rather than impairs their deeds, and carries out the original intent of the parties. Watson *v.* Mercer, 8 Peters, 88.

Or if a State grant lands, but makes no stipulation not to legislate further upon the subject, and proceeds to prescribe a mode or form of settling titles, this does not impair the force of the grant, or take away any right under it. Jackson *v.* Lumpkin, 3 Peters, 280.

Nor does it, if a State merely changes the remedies in form, but does not abolish them entirely, or merely changes the mode of recording deeds, or shortens the statute of limitations. 3 Peters, 280; Hawkins *v.* Barney's Lessee, 5 ib. 457.

It has been held, also, not only that a legislature may regulate anew what is merely the remedy, but some State courts have decided that it may make banking corporations subject to certain penalties for not performing their duties, — such as paying their notes on demand in specie, and that this does not violate any contract. Brown *v.* Penobscot Bank, 8 Mass. Rep. 445; 2 Hill, 242; 5 Howard, 342. It is supposed to help enforce, and not impair, what the charter requires. But on this, being a very different question, we give no opinion.

But look a moment at the other class of decisions. Let a charter or grant be entirely expunged, as in the case of the Yazoo claims in Georgia, and no one can doubt that the obligation of the contract is impaired. Fletcher *v.* Peck, 6 Cranch, 87.

So, if the State expressly engage in a grant, that certain lands shall never be taxed, and a law afterwards passes to tax

them. State of New Jersey *v.* Wilson, 7 Cranch, 164. Or that corporate property and franchises shall be exempt, and they are then taxed. Gordon *v.* Appeal Tax Court, 3 Howard, 133.

So, if lands have been granted for one purpose, and an attempt is made by law to appropriate them to another, or to revoke the grant. Terrett *v.* Taylor, 9 Cranch, 43 ; Town of Pawlet *v.* Clark, 9 Cranch, 292.

Or if a charter, deemed private rather than public, has been altered as to its government and control. Dartmouth College *v.* Woodward, 4 Wheat. 518.

Or if owners of lands, granted without conditions or restrictions, have been by the legislature deprived of their usual remedy for mesne profits, or compelled to pay for certain kinds of improvements, for which they were not otherwise liable. Green *v.* Biddle, 8 Wheat. 1.

Or if, after a mortgage, new laws are passed, prohibiting a sale to foreclose it, unless two thirds of its appraised value is offered, and enacting further that the equitable title shall not be extinguished till twelve months after the sale. Bronson *v.* Kinzie, 1 Howard, 311 ; McCracken *v.* Hayward, 2 ib. 608.

These last cases in Wheaton and Howard are very near in point to the present one, though, in my view, a less strong and decisive encroachment on a previous contract than this is.

So are the cases very near where all remedy whatever is taken away, and it is held that the obligation of the contract is thus impaired. See some before cited, and 8 Mass. Rep. 430 ; 2 Gall. 141 ; 2 Greenl. 294 ; 1 Howard, 311 ; 3 Peters, 290 ; 2 Howard, 608.

The whole usefulness and value of a note or contract is in this way destroyed, and that without any reference to the contract itself. For these reasons, the judgment below must be reversed.

### BALDWIN ET. AL. *v.* PAYNE ET AL

This case involves several of the questions just discussed in that of the Planters' Bank *v.* Sharp et al.

Some of the points of difference are merely nominal ; as, for instance, that the charter of the Mississippi Railroad Company, which transferred the notes in this case, is different. But, it being subsequent in date to the charter to the Planters' Bank, and with "all the usual rights, powers, and privileges of banking which are permitted to banking institutions within the State," the court seemed, by mutual consent of parties, to regard those conferred on the Planters' Bank as extensive as any, and therefore a correct guide here.

Other differences may be more material in appearance, as that the transfer in this case was found by the special verdict to have been in payment of a debt of the bank; and another, that the suit here is in the name of the indorsee, and not, as in the former case, in the name of the promisee.

Its being assigned in payment of a debt is, however, no more than was presumed might have been the truth in the other case. And its being sued in the name either of the indorsee or payee can make little difference on the final construction given by the State court to the prohibitory law in the action of the Planters' Bank v. Sharp et al. That construction, we have seen, was, that it is the transfer itself which is prohibited and made in some degree penal, rather than the action in the name of the indorsee being all which is prohibited. It will be remembered, also, that if the State might be able, by a general repealing law, to prevent a suit in the name of an indorsee, without impairing any contract in the charter itself, as is argued for the defence, it could hardly do this without impairing the other contract, between the bank and the maker, by which the latter promises to pay any indorsee.

Certainly the new prohibitory law ought not to have attempted more than a repeal of the statute allowing suits by indorsees of negotiable paper in their own name. Then the indorsees of notes negotiable, as of notes not negotiable, would still possess a right to sue their notes in the names of the payees.

In such a case, there would be some plausibility in the idea, that, though the action would not lie in the name of the indorsee, yet if it could in the name of the payee, for and on his account, the prohibitory law would chiefly affect the remedy, and not the right of action in some form or other.

But even then, if the obligation or force or duty of the contracts, whether with the bank by the State, or with the maker, was impaired in any degree, though under cover of affecting the remedy only, it would come within the constitutional restriction.

But how much more must it so come in this case, as well as the other, where, instead of merely changing the obligation so as to render a recovery on the contract not permissible in the name of an assignee, but more inconvenient, expensive, dilatory, and often difficult, in the name of another, the payee, the State court of Mississippi hold, that the legislature, by the prohibitory law of 1840, not only meant to abate a suit in the name of an indorsee, but in the name of the payee, if a transfer had once been made. Substantially, they consider any suit on the note, by any body, after it has once been transferred, as

illegal, and the right to enforce the contract to be lost or forfeited for ever.

This view of the statute of 1840 being regarded as established in Mississippi, renders it clear that in this case, as well as the case of the Planters' Bank v. Sharp et al., the law under which this action has been abated must be considered as having impaired the obligation of contracts, and therefore to be in this respect unconstitutional, and the judgment of the State court erroneous.

The judgment below, must, therefore, be reversed, and as a special verdict was found in this case, judgment must be entered on it in favor of the original plaintiffs.

Mr. Chief Justice TANEY and Mr. Justice DANIEL dissented.

Mr. Justice McLEAN.

So far as the seventh section of the act in question has been construed, by the Supreme Court of Mississippi, to invalidate the note between the bank and the payee, it is unconstitutional. The fair import of the provision takes away only the negotiability of the instrument. But the courts of Mississippi have decided, where a note has been assigned in violation of the statute, that no suit can be sustained on the note, either in the name of the assignee or of the payee. This impairs the obligation of the contract, which the Constitution inhibits.

The argument, that, where the bank attempts to transfer a note by a void indorsement, it must be reindorsed to enable the bank to sue in its own name as payee, is unsustainable. A void indorsement is no indorsement, and it can have no effect on the validity of the note. The section declares, that " it shall not be lawful for any bank in this State to transfer, by indorsement or otherwise, any note, bill receivable, or other evidence of debt; and if it shall appear in evidence, upon the trial of any action upon such note, bill receivable, or other evidence of debt, that the same was transferred, the same shall abate upon the plea of the defendant."

The object of the statute was to secure the right of the debtors of a bank to pay their debts in its own paper. This they could not do, if the notes, before they were payable, had been assigned by the bank. No fair construction of the seventh section can authorize a forfeiture of the note, by reason of the illegal indorsement. It is, therefore, unnecessary to consider whether such a provision would be constitutional.

The bank had the power, under its charter, to assign promissory notes. If this were not so, the law to prohibit the as-

signment would have been unnecessary.    There being no express power in the charter of the bank to indorse notes, it must be considered as exercising the power under the general law making notes negotiable; and in this respect it must stand on the same ground as an individual.    And this presents the question, whether the repeal of the law making notes negotiable by banks can affect notes executed before the repeal. A majority of the judges hold that a provision so construed is void, as it impairs the obligation of the contract.    I dissent from this conclusion.

An individual holds a note, which, under the statute, is negotiable ; but the statute is repealed.    Does this take away the negotiability of the note?    I think it does.    There can be no doubt of this, unless such a construction shall impair the obligation of the contract.    Now, what obligation is violated by this construction?    It is said, that the maker of the note promised to pay to the assignee of the payee.    This is admitted. But until the note be assigned, there can be no assignee.    The indorsement is a new contract between the indorser and the indorsee ; and when this contract is made, it can no more be impaired than the contract between the maker and the payee of the note.

A promise to pay to A. B. or his assignee is no contract with the assignee, until the new contract of assignment be made. The promise is to pay to the indorsee, if the payee of the note shall indorse it.    But the payee is under no obligation to indorse the note.    And if there be no obligation, how can it be impaired ?    A contract binds a party either to do or not to do a certain thing.    The maker of the note, on a certain contingency, binds himself to pay the indorsee, and that contingency depends upon the will of the payee; but until that will is exercised, there is no obligation by the maker.    The payee has power to bind the maker of the note to pay its contents to some other person ; but until that power is exercised, there is no contract which can be impaired.

Suppose a power of attorney was given to A by B, to enable him to bind B, by a written instrument, to do a certain thing which may legally be done, but, before the instrument is executed, the thing is made unlawful ; does this impair the obligation of the contract ?    The instrument contemplated has no existence ; B cannot complain that he has not been bound to do the act, and on what ground can A complain ?    Is his contract impaired ?    He has no contract.    He had the power to make a contract, which he failed to exercise.    And this is the principle involved in he case now under consideration. The payee had a discretionary power to bind the maker of the

note, but he did not exercise it until the assignment of the note was made illegal. Is a mere power of attorney to make a contract within the Constitution? It is essential, to constitute a contract, that there shall be two parties bound by it. Now the payee is not bound to assign the note, though the maker has authorized him to assign it. This, then, is a mere power to make a contract, which may or may not, at the discretion of the payee, be exercised. It is a mere unexecuted power to make a contract, and is, in my judgment, not within the Constitution.

If the charter of the bank had contained a special provision, authorizing it to assign promissory notes, no subsequent act of the legislature could repeal or modify such provision, against the consent of the bank.

### Mr. Justice DANIEL.

Differing from the majority of the court in the decision just pronounced, I might, nevertheless, have been disposed to acquiesce in that decision, had it related to questions merely of property or of individual interests; but embracing as it does a construction of the Constitution, and annulling at the same time a legislative act of a sovereign State, I cannot feel warranted in yielding by silence a seeming approbation of conclusions which my judgment entirely repels. My deliberate opinion, then, is, that the statute of Mississippi of February 21st, 1840, by its seventeenth section, comes not in conflict with the tenth section of the first article of the Constitution; that it in no wise impairs the obligation of any contract between the State and the Mississippi Railroad Company, formed by grant of the charter of that company, nor as existing with the plaintiffs in error as claiming under them. An elaborate review of the arguments on which the pretensions of the plaintiffs in error are urged is not here deemed necessary, nor will I enter much in detail upon the reasons by which those arguments appear to be met and overthrown, but will content myself with succinctly stating the decisive conclusions of my own mind upon the only question properly presented by this record, and the legal grounds on which those conclusions are bottomed. The rights of the plaintiffs in error, whatever they may be, it must be borne in mind, are derived from the charter of the Mississippi Railroad Company, or from that of the Planters' Bank of Mississippi, as supposed to possess rights and powers more comprehensive than those vested in the former company; but from whichsoever of those companies the plaintiffs in error may choose to deduce their rights, these must be restricted to the rights and authority vested in the source from which they are

drawn.  Both the Mississippi Railroad Company and the Plant-
ers' Bank of Mississippi are corporations created by statute, de-
riving their existence and every power and attribute they ever
possessed from the laws which gave them existence, and from
these only. . The doctrine has been long and repeatedly affirm-
ed by this court, that, in interpreting the powers and rights of
corporations, an essential distinction must be taken between
corporations existing by the common law (often, nay, necessa-
rily, traceable to a remote and obscure antiquity), and those
which are created by statute, whose constitutions and powers
are defined and ascertained by accessible and visible proofs.
Into the composition or practices of the former, tradition, im-
plication, or usage may enter, and thus give room for assump-
tions of power; with respect to the latter, no such rule, or
rather misrule, has obtained or been permitted, especially by
the settled decisions of this day.  The adjudications of this
court, as has been already stated, are too explicit to admit of
doubt on this subject.  Thus, in the case of Head and Amory
*v.* The Providence Insurance Co., 2 Cranch, 127, Chief Jus-
tice Marshall says, — " Without ascribing to this body (the In-
surance Company), which in its corporate capacity is the mere
creature of the act to which it owes its existence, all the qual-
ities and disabilities annexed by the common law to ancient
institutions of this sort, it may correctly be said to be precise-
ly what the incorporating act has made it; to derive all its
powers from that act, and to be capable of exerting its faculties
only in the manner which that act authorizes.  To this source
of its being, then, we must recur, to ascertain its powers, and
to determine whether it can complete a contract by such com-
munications as are in this record."
    In the case of Dartmouth College *v.* Woodward, 4 Wheat.
636, it is said by the court, that " a corporation is an artificial
being, invisible, intangible, and existing only in contemplation
of law.  Being a mere creature of the law, it possesses only
those properties which the charter of its creation confers upon
it, either expressly or as incidental *to its very existence.*"  In
the case of The Bank *v.* Dandridge, 12 Wheat. 64, this court
said, — " Whatever may be the implied powers of aggregate cor-
porations at the common law, and the modes by which those
powers are to be carried into operation, corporations created
by statute must depend, both for their powers and the mode
of exercising them, upon the true construction of the statute
itself."  In the case of The Bank of Augusta *v.* Earle, 13 Peters,
587, the several authorities just mentioned are cited in the
opinion of the court; all of them approved, and none of them,

it is presumed, will be questioned as not laying down the law
with perfect accuracy.

· · Such being the well-settled rule of this court with respect
to statutory corporations, let us inquire into its operation· on
the case before us. Neither by the charter granted to the Mis-
sissippi Railroad Company, or to the Planters' Bank of Missis-
sippi, nor to any other banking corporation within the State,
was the power ever directly given to assign bonds, bills, or
promissory notes. Is this power necessarily *implied* in any of
the express grants contained in the· charters now under con-
sideration? It is admitted on all sides that the clause in this
charter of the Planters' Bank which authorizes the bank to
discount bills of exchange and notes, and to make loans, con-
tains no such direct grant.; but it is said that the bank is
authorized to possess and receive lands, rents, tenements, her-
editaments, goods, chattels, and *effects,* to· a certain amount,
and to· grant, demise, alien, or *dispose* of the same for the good
of the bank; and that this authority confers the power of
*assigning* notes discounted by· the corporation. Could the·
doctrine of implied powers, in contravention of the express de-
cisions of this court just cited, be extended in its utmost lati-
tude to these statutory corporations, still it would seem difficult,
even by the greatest violence of construction, to torture the
language of this charter into an expression of the meaning
here ascribed to· it. The right to *acquire.* and to *dispose* of ·
*effects* cannot, by the natural import of language, nor by any
received intendment, be made to signify the power to *discount*
bills and notes; much less can it be interpreted to mean the
power to transfer bills and notes discounted, or securities of
any description, and beyond this even, the power (in opposition
to the principles of the common law in reference to choses in
action) of investing the assignee with the right of maintaining
an action at law in his own name. The extravagance of the
construction contended for on behalf of the plaintiffs may be
seen by bringing it to another test. Let it be supposed that
the charters of these companies contained not one word about
rights and powers of *banking,* as ·then permitted to other cor-
porations in the State of Mississippi; suppose, too, they had
been silent as to any right to *discount* bills and notes, and had
been limited to the simple power of receiving and possessing
goods, *chattels,* and *effects,* and of *disposing·* of such *effects* for
the good of the bank; would it be pretended that, under this
latter provision, the power of *discounting* bills or notes, or of
discounting at all, was given by the mere import of the word
*effects,* — that the power of *receiving and disposing of effects*
meant the power of discounting bills and notes? This can

hardly be pretended.   If, then, this term be not synonymous with the words *bills* and *notes* when taken in connection with the power of discounting and of making loans, how can it become so by being connected with the right of acquisition and enjoyment, or with the *jus disponendi?*   The power to sell or assign discounted notes cannot be deduced from the clause in the charter which authorizes the exercise of the usual banking powers granted to the banks of Mississippi, first, because in no charter granted by the State is it shown that such a right is expressly conferred; secondly, it is manifest that a traffic in the sale of its own paper, or in notes or bills discounted, is conformable neither with the regular functions of a bank, nor reconcilable with the purposes of its institution.   Banks are usually created for the purpose of making loans, and this in a medium, in theory at least, equal to money; not for the purpose of borrowing, or of raising means to eke out their daily existence by selling off their securities or their own paper. Their establishment rests upon the idea of their possessing funds of their own as the foundation of their credit and of their circulation.   The practice of becoming brokers for the sale of their own paper or the paper of their customers, to put themselves in funds, is not, therefore, one of their regular functions, and can flow only from an abuse of these functions, and is a perversion of the legitimate ends of their creation.   So, too, it is entirely inadmissible to place this practice of brokerage by the bank upon the mere absence of an inhibition in the charter; such a mode of reasoning cuts up entirely the admission, that the banks have no power except such as is expressly granted or necessarily implied.   The fallacy of the idea, that the right to *dispose* of *effects* conferred by the charter of the Planters' Bank implied the right of an habitual and unrestricted sale or brokerage of discounted notes, is exposed by adverting to another provision of the charter, by which the amount of effects of every kind which the bank was permitted to acquire and dispose of was positively limited to a specified amount.   The power of the bank being thus restricted, that power could by no sound reasoning be made coincident or coextensive with regular and permanent operations on the part of this corporation; for if its banking powers were deducible from such a limited privilege, or were dependent upon it, of course, when this permitted limit should be attained, the operations of the bank would be at an end.   It is clear, therefore, that these corporations, restricted as are all statutory corporations under the decisions of this court, to the express grants contained in their charters, and to implications necessary to and inseparable from those grants, never were by the provisions

of their charters invested with the power to assign bills or notes, and, much less by such assignment to invest their assignee with the right of suing at law ; that whatever power of assignment these corporations at any time may have ·possessed, and whatever the effect implied in such assignment, both were conferred upon them in common with all other persons, natural or artificial, within the State, by a general public law, subject at all times to modification or repeal by the authority which enacted it. *Vid.* section 12 of the statute, Howard and Hutchinson's Laws of Mississippi, p. 373.

The actual repeal of such a statute cannot correctly be regarded as the violation of any vested right, or the impairing of the obligation of a contract, for no one can claim to have a perfect and vested right, through all future time, in the *mere capacity* to do an act, from the absence of a law forbidding that act. A pretension like this would forestall and prevent legislation upon every subject. A wholly different state of things would have existed had the assignment to the plaintiffs been made anterior to the repeal of the statute, for then the rights of these parties would have been vested and complete ; but the assignment was in this instance subsequent, by more than a year, to the passage of the repealing statute, was a new and separate contract, and entered into with necessary knowledge of its provisions, and made apparently in defiance thereof. This view of the question is clearly and forcibly presented by the Supreme Court of Louisiana, in the case of Hyde and another *v.* The Planters' Bank of Mississippi, 8 Robinson, 416, a case arising upon the laws and charters now under consideration, and in all its features essentially, nay, *mutato nomine*, literally, the same with the present. It has been said, that, in the case from 8 Robinson, the note was made after the enactment of the repealing statute. I think that this statement is not warranted by the statement of facts in that case. Certainly the reasoning of the court rests on no such hypothesis, for it covers the whole of the language and policy of the statute of Mississippi, and vindicates them to the utmost extent. In this case, the note was assigned after the enactment of the repealing law, and with full knowledge thereof, and the assignment was an independent and posterior contract which the law had forbidden. The question, then, as to the validity of the statute of Mississippi seems to resolve itself into this inquiry, — whether a sovereign State of this Union possesses the right within her own territory to regulate the formation of contracts, to define the rights and interests such contracts shall give to the parties thereto, and to declare the modes and extent in and to which these may be enforced by her own tribunals.

To such an inquiry I can give none but an affirmative answer; and any other, I feel assured, is not evoked either by the language or spirit of the Federal Constitution, and would be highly unjust and inconvenient with respect to the States.

With regard to the plaintiffs in error, no injustice nor hardship of any kind is perceived in enforcing against them the provisions of the statute of 1840. In the first place, they have, with full knowledge of the law, placed themselves directly in the attitude of resistance thereto; for they have entered into an agreement explicitly inhibited upon grounds of public policy, and this long after such inhibition was proclaimed to every person within the State. In the next place, there surely can be no merit in a combination, the effects and manifest purposes of which were to deny to the holders of the notes of these banking corporations the power of making payment to them in their own currency, and to enable the latter to seize or to appropriate to themselves or their favorites. the substance of those very note-holders to whom such right of payment was denied. A proceeding thus subversive of justice has not been heretofore sanctioned by this court, and in one instance has been, to a certain extent, — indeed, as I think, to the whole length of the present case, — directly condemned. The case of the United States *v.* Robertson, 5 Peters, 641, was a case in which a judgment had been recovered by the United States against the Bank of Somerset for an amount of money which had been deposited by a collector in that bank. By an act of Congress of the year 1818, it was provided, that, in any suit thereafter instituted by the United States against any corporate body for the recovery of money upon any bill, note, or other security, it should be lawful to summon as garnishees the debtors of such corporation, who were required to state on oath the amount in which they stood indebted at the time of serving such summons, for which amount judgment should be entered in favor of the United States, in the same manner as if it had been due and owing to the United States. On the 9th of February, 1819, a year after the act of Congress giving the remedy by attachment to the United States, the legislature of Maryland passed an act declaring that, in payment of any debt due to or judgment obtained by a bank within that State, the notes of such bank should be received. Attachments were laid in behalf of the United States, after their judgment against the Bank of Somerset, on debts in the hands of various debtors to the bank, and on some of these attachments judgments had been obtained. It was contended in behalf of these garnishees, that they had a right to discharge their debts in the notes of the Bank of Somerset, as well in those cases in

which judgment had been obtained on attachment by the United States as in those wherein there were no judgments. Upon this question Chief Justice Marshall, in delivering the opinion of the court (p. 659), remarks, first, upon the act of Congress of 1818, — " That it operates a transfer from the bank to the United States of those debts which might be due from the persons who should be summoned as garnishees. They become, by the service of the summons, debtors of the United States, and cease to be debtors of the bank. But they owed to the United States precisely what they owed to the bank, and no more "; 2. " That the act of the legislature of Maryland of 1819, so far as respects debts on which judgments have not been obtained, embodies the general and just principles respecting effects, which are of common application. Every debtor may pay his creditor with the notes of that creditor. They are an equitable and legal tender. So far as these notes were in possession of the debtor at the time he was summoned as garnishee, they form a counter claim, which diminishes the debt due to the bank to the extent of that counter claim. But the residue becomes a debt to the United States, for which judgment is to be rendered. May this judgment be discharged by the paper of the bank? On this subject the court are divided. Three of the judges are of opinion, that, by the nature of the contract, and by the operation of the act of Maryland upon it, an original right existed to discharge the debt in the notes of the bank, which original right remains in full force against the United States, who come in as assignees in law, and not in fact, and who must therefore stand in the place of the bank. Three of the judges are of opinion, that the right to pay the debt in the notes of the bank does not enter into the contract." May not this decision, I inquire, be considered as substantially covering the whole ground of the case before us? For, after stating that the garnishees became by the service of the summons the debtors of the United States, and ceased to be the debtors of the bank, it goes on to declare, that they owed to the United States what they owed the bank, and nothing more ; that, by the just and general principles of set-off, every debtor may pay his creditor with the notes of that creditor, which as to him are an equitable and legal tender. And by the unanimous declaration of the court, not until after the claim against the garnishee was carried into a judgment, and after the allowance of all rights of tender and set-off in the notes of the bank, could payment be coerced from him in any other medium than the notes of the bank. One half the court deemed the garnishee, even after judgment, entitled to the same privileges against the creditor of the bank which he pos-

sessed against the bank itself. This right, as between note-holders and the assignees of a failing or insolvent bank, is fully sustained by the Court of Appeals of Maryland in the case of The Union Bank of Tennessee *v.* Ellicot, Morris, & Gill, 6 Gill & Johns. 364, and in that of The Bank of Maryland *v.* Ruff, 7 ib. 448, in which last case the authority of this court is relied on. But, at all events, the principles of these decisions are broad enough to vindicate the legislation of Mississippi, and the objects of that legislation, against the imputation of oppression or hardship as respects these plaintiffs, and all who may occupy a similar position, if legislation can need vindication or apology, the purposes of which are to prevent, if possible, the paper of these corporations, spread over the community by them, from utterly perishing on the hands of the note-holder, and to disappoint dishonest combinations to set the public laws at defiance, and, further, to oppress and ruin the note-holder by taking his property, and leaving him the worthless and false and simulated representatives of an equivalent. I am of the opinion, that the judgment of the Supreme Court of Mississippi should in both these cases be affirmed.

## Order.

THE PLANTERS' BANK *v.* SHARP ET AL.

This cause came on to be heard on the transcript of the record from the High Court of Errors and Appeals of the State of Mississippi, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said High Court of Errors and Appeals in this cause be and the same is hereby reversed, with costs, and that this cause be and the same is hereby remanded to the said court, to be proceeded with in conformity to the opinion of this court, and as to law and justice shall appertain.

## Order.

BALDWIN ET AL. *v.* PAYNE ET AL.

This cause came on to be heard on the transcript of the record from the High Court of Errors and Appeals of the State of Mississippi, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said High Court of Errors and Appeals reversing the judgment of the Circuit Court of Jefferson county in this cause be and the same is hereby reversed, with costs, and held as entirely void, and that the said judgment of the said Circuit Court of Jefferson county be in all things affirmed and re-

main in full force and virtue, the said judgment of the said High Court notwithstanding; and that this cause be and the same is hereby remanded to the said High Court of Errors and Appeals, to be proceeded with in conformity to the opinion of this court, and as to law and justice shall appertain.