THE STATE, WILLIAM BRITTON ET AL., PROSECUTORS, v. JOSEPH BLAKE, ELIAS R. WILLIAMS, AND ELIJAH P. OLIVER, MANAGERS.

1. An act to authorize the drainage of marshy lands held to be constitutional, although the land-owner may possibly be burdened in excess of the advantages actually realized from the work done under it; the project being entirely within the control of those to be affected by it, the presumption is that they will enter upon no undertaking which will not prove remunerative.

2. It is not essential to the validity of the act that it should give an appeal from the assessment.

State, Britton et al., pros., v. Blake et al.

3. A party who desires a review by *certiorari*, of proceedings taken under such act, must exercise reasonable diligence in prosecuting it.

4. The sovereign power may resume the grant of a franchise before it has been accepted, and rights acquired under it.

5. If two acts are so inconsistent and contrary that both cannot stand, the latter will abrogate the former. If both can, by any reasonable construction, be upheld, the latter will not operate as a repeal of the former. In either case the latter act survives the repealer.

On *certiorari* to set aside assessment made under the act of April 21st, 1868, authorizing the draining of wet and marshy lands in the upper parts of the counties of Morris and Somerset.

The several grounds upon which it was sought to set aside the assessments, are fully set forth in the opinion of the court.

The case was argued in February Term, 1871, before Justices VAN SYCKEL and SCUDDER.

For the prosecutors, *A. W. Cutler.*

For the defendants, *H. C. Pitney.*

The opinion of the court was delivered by

VAN SYCKEL, J. By an act of the legislature of this state, approved April 21st, 1868, the owners of wet and marshy lands lying on the upper Passaic and its tributaries, in the counties of Morris and Somerset, were authorized to institute a system of drainage, and assess the cost of making the same upon the owners of the lands drained, according to the benefits conferred.

The act provided for the election of three managers, to hold their office for one year, and until others were elected in their stead. These managers were authorized to purchase the property described in the twelfth section of the act as "Dunn's mill property," and to pay for the same out of the moneys raised by assessment.

In June, 1868, the first managers were elected, and there-

upon they proceeded to make, or cause to be made, a survey and assessment of the lands benefited by the scheme of drainage which they adopted, a copy of which assessment was filed in the office of the clerk of Morris county, and also in the office of the clerk of Somerset county, November 21st, 1868.

In July, 1868, the managers made a contract for the purchase of Dunn's mill property, which they alleged to be the premises described in the act as Dunn's mill property, the conveyance to be made in the following January.

On the 26th day of December, 1868, at which time the assessments were all due, the prosecutors, in connection with a large number of other land-owners, filed their bill in the Court of Chancery, to enjoin the managers from taking any proceedings for the purchase of said Dunn's mill property, or from carrying out the contract concerning the same, or applying any of the moneys raised by the said assessment to such purchase, on the ground—*First.* That the purchase was not authorized by the legislative act; and, *Secondly.* That it was not necessary for effecting its object. An injunction issued in accordance with the prayer of the bill, December 28th, 1868, and was served December 29th, 1868. The managers being required by their contract to complete the purchase of the mill property on the 1st day of January, 1869, procured the title to be made to one Craig, who executed to them a written declaration of trust.

At the time the bill was filed, about $2000 of the assessments had been paid, and, pending the litigation in that case, the additional sum of $5000 was collected.

The suit in chancery was brought to hearing upon bill, answer, and proofs, and an agreement in writing was signed by the counsel of the respective parties, that if the Chancellor should be of opinion that the managers were empowered to purchase Dunn's mill property, a decree should be made that said managers hold said property in trust under the provisions of the legislative act. The Chancellor being of opinion that the act in question authorized the purchase, by his decree bearing date June 16th, 1869, dissolved the injunction, and

ordered, by the consent of parties in open court, that the managers should hold the mill property in trust for the purposes of said act.

The money collected under the assessments was afterwards applied to the payment of the purchase price of this property.

The assessment made by the managers is removed into this court, and sought to be set aside by a writ of *certiorari* allowed October 4th, 1869.

The reasons assigned for reversal which I deem necessary to consider are:

1. That the assessments were made upon an erroneous principle, and not in proportion to the benefits conferred. This reason is not supported by the facts in the case. The evidence shows that no one was assessed in excess of the extent to which, in the opinion of the managers, he would be benefited.

2. The relators charge that by the provisions of this act private property is taken for private use, and that, therefore, the act is unconstitutional. This branch of legislative power which regulates the construction of ditches and sewers and the drainage of meadows and marshy lands has been exercised so long, and is so fully recognized, that it is now too late to call it in question. It is clearly affirmed in the *Tidewater Co.* v. *Coster*, and cannot be opened to discussion.

It is true that the seventh section of the act in question does not expressly limit the assessment to the extent of the benefits to be conferred, but authorizes the entire cost of the improvements to be levied upon the lands benefited in proportion to the benefits derived, so that the land-owner may possibly be burdened in excess of the advantages actually realized from the work. But it will be observed that such a contingency is not contemplated by the law, and that is not the theory upon which it is framed, and upon which measures of like import have been sustained. The whole project is within the control of the parties to be affected by it, and the presumption is, that they will enter upon no undertaking which will not prove amply remunerative in its results, in

which event the benefits will always be at least equal to, if not in excess of the assessments. The opposite result can only follow an injudicious use of the authority granted, and cannot impeach the integrity of the law.

The constitutionality of this law is also denied, because it contains no clause giving the land-owner an appeal from the assessment.

There is in our organic law no limitation of power which restrains the law-maker to guarantee an appeal in these instances, and it will be found upon an examination of our statute books, that hundreds of these acts have been passed, which give no review; among others is the act to drain the Riser in Bergen county, (*Laws* 1850, *p.* 292,) which was held to be constitutional by Chancellor Williamson, in *Berdan* v. *The Riser Drainage Co.* (See case referred to in 3 *C. E. Green* 69.)

3. It does not appear upon the face of the assessment, or by any certificate of the managers, that they pursued their authority strictly, by imposing the assessments according to their judgment of the benefit which would accrue to each land-owner. This objection to the validity of the proceedings rests not upon the failure of the managers to proceed upon a correct principle, but upon their omission to certify the rule which guided their action.

Even though there be uniformity in the assessment in this respect, this exception ought not to be entertained at this stage of the case. Before suing out the writ of *certiorari* they have permitted a large portion of the assessment to be collected and applied to the purchase of Dunn's mill property, which, by a decree of the Court of Chancery, made under their own agreement, is now held in trust for their benefit. To set aside this assessment upon the application of the relators, while they retain the trust property, would be an act of manifest injustice.

This court will always exercise a proper discretion in withholding an opportunity of reviewing the proceedings of inferior tribunals, where there has been unreasonable delay, and they may quash a writ for such cause upon the argument of the merits. *Haines* v. *Campion*, 3 *Harr.* 49; *State* v. *Everitt*,

State, Britton et al., pros., v. Blake et al.

3 *Zab.* 378 ; *State* v. *Water Comm'rs*, 1 *Vroom* 247 ; *State* v. *Newark*, 1 *Vroom* 304.

In *The State* v. *Water Commissioners of Jersey City*, in which an assessment for the construction of a sewer was brought up by *certiorari*, Justice Haines says that "a party who desires a review of such proceedings, should exercise reasonable diligence in having it done. There is neither reason nor justice in his standing by while a large expenditure is being made for a supposed public benefit, and after it is completed, to enjoy the benefit, and then for some supposed or real error, or informality, to have the proceedings and assessments against him set aside, and so save himself from his share of the expense."

In the case now under consideration there is even less claim to relief on the part of the relators. They have received the advantage of the execution of the scheme thus far; Dunn's mill property has been purchased, and, by virtue of a decree obtained by their procurement, is held for them, with the other land-owners, and they must necessarily share the advantages which will result from abating the dam.

Under these circumstances, it is too late for them to invoke, in aid of the prosecution of their *certiorari*, an imperfection which exists not in the actual mode of imposing the assessment, but in the manner of certifying the result of the work.

But I am not satisfied that it is necessary to suggest the delay of the relators, and the peculiar circumstances which restrain them, in order to save this assessment.

The seventh and eleventh sections of the act prescribe the duties of the managers in this respect.

Section seven provides that the managers shall, from time to time, as required, make an assessment, give notice thereof, in writing, to the land-owners, and also file in the office of the clerks of both Morris and Somerset counties, copies of such assessments, which shall remain a lien on the property of each owner until the same is paid or otherwise discharged by due course of law.

Section eleven directs that the managers shall keep a record

of all their proceedings, and of the moneys received and expended by them. There is no direction that a certificate or return shall be made and filed by the managers, but the assessment itself is required to be filed in the office of the county clerk, that all persons may have notice of it, because it is a lien upon the lands until paid.

The term assessment, in the seventh section, has a like significance with that word as used in the general tax laws, in defining the duties of the assessor, and is intended to designate the result of the labors of the managers, which is expressed by a statement of the quantity of land of each owner, the class in which it is rated, and the amount of the imposition. It is the assessment which is to be filed, and not a certificate of the principle upon which it is made. This section contemplates frequent assessments in pursuit of the objects of the enactment, and cannot be fairly held to require a technical certificate in regard to the principle which governs the laying of the burden in every instance. The eleventh section provides for the keeping of a record by the managers, but the validity of their action, under the seventh section, is not dependent upon their compliance with this requirement, and their inartificial manner of making up such record cannot be successfully appealed to by the prosecutors, in avoidance of their share of the cost of the undertaking.

4. It further appears in support of the reversal of this assessment, that the lands of the prosecutors are subject to be assessed under a drainage act, passed March 24th, 1868, (*Laws of* 1868, *p.* 469,) and it is, therefore, claimed that they cannot be within the operation of the act of April 21st, 1868. But it is not shown the earlier act has been adopted by the parties interested, or that any action has been taken under it.

Until such acceptance is signified and rights have been acquired under it, it is no invasion of constitutional guarantees for the sovereign power to resume the grant. Such repeal may be effected by express words or by implication.

If the two enactments are so inconsistent and contrary

that both cannot stand, the latter will abrogate the former. If both acts can, by any reasonable construction, be upheld, the latter will not operate as a repeal of the former. In either case the later act is intact. *Chesapeake & Ohio Co.* v. *Baltimore & Ohio R. R.*, 4 *Gill & Johns.* 6; *Smith on Stat. Law*, § 757.

5. By an act passed March 16th, 1870, (*Laws of* 1870, *p.* 602,) the act of April 21st, 1868, is repealed, excepting and reserving, however, all property, rights, privileges, matters, and things, liabilities, agreements, or responsibilities legally acquired, incurred, assumed, performed, or made under or by virtue of the act so repealed; and by force of the repealer it is insisted that the assessment falls.

The saving clause in this enactment shields the assessment made before the repeal from its operation. The assessment was perfected and the lien had attached, and the remedy to collect it must also inhere as an incident essential to the enjoyment of the right saved.

Even if this were not so, it is very doubtful whether the grant of the franchise can be resumed by the legislature, or its substantial advantages be impaired without the consent of the grantees. It is in the nature of a contract, and those who procured the passage of the act having entered upon the development of their scheme, and made large outlays in its promotion, have acquired rights which must be regarded. 4 *Wheat.* 519; *Planters' Bank* v. *Sharp*, 6 *How.* 301; *People* v. *Manhattan Co.*, 9 *Wend.* 351; *Bridge Co.* v. *Hoboken Co*, 2 *Beas.* 81; *Smith on Stat. Law*, §§ 775, 757; *Cooley on Con. Law* 279, and note; 4 *Barb. Sup. Ct.* 75.

William Britton is assessed upon twenty-four acres of land more than he owned, and there must be an abatement in his assessment. If parties cannot agree upon the sum to be abated, it will be settled according to the rules and practice of this court, upon application, under an act passed April 6th, 1871.

6. There are a number of reasons assigned, to the effect that in point of fact the lands of the prosecutors are not

benefited by the execution of the act. These reasons are not entitled to consideration ; that question must be left to the determination of the managers to whose judgment it is submitted. They make up their results upon careful surveys, an inspection of the lands, a knowledge of the topography of the country and the character of the soil, and the conclusion which they reach will be far more reliable than any opinion which this court might form from its imperfect knowledge of controlling facts.

7. The only remaining question which is controverted, touches the right of the first managers to pursue the collection of the assessments.

The first section of the act authorized the land-owners, by plurality of votes, to elect three managers on the 1st day of June next following the approval of the act, who were to hold their office for one year, and until others were elected in their place.

Under this provision, managers were duly elected in June, 1868, and by virtue of the ninth section their successors were duly elected in the following June, since which time there has been no other election of managers. The contest for control of the affairs of the company is between these two boards.

The first managers insist that inasmuch as nothing remains to be done except to collect the unpaid assessments which they imposed, and reimburse themselves the money they have advanced, they should be permitted to complete what they initiated during their year of service. If this was to be determined upon the consideration of expediency, this claim might prevail, but it is a question of power, to be regulated and controled by the provisions of the act.

Section nine, after directing the manner of electing the second board of managers, declares that the managers elected at such annual meeting shall be clothed with and authorized to exercise all the powers in said act conferred on the managers who shall be first elected ; and section eleven requires the managers, who shall from time to time be elected, to pass over all records, books, maps, papers, and moneys in their

hands to their successors in office, as soon as they shall be qualified to act. If the usual significance is given to language, there can be no doubt that the official existence of the first managers terminated when their successors were qualified. Any other interpretation would complicate the affairs of this company, by putting its management in the hands of as many different sets of directors as it had years of existence.

In my opinion the assessment should be affirmed, with costs, as to all the prosecutors except William Britton, whose assessment is to be corrected.

Ordered accordingly.

AFFIRMED 7 *Vr.* 442.
CITED *in State, Grant, pros.,* v. *Clark,* 9 *Vr.* 104.