## JONAH  K.  KALANIANAOLE  *vs.*  PACIFIC  MAIL STEAMSHIP  COMPANY.

### July 14, 1905.

*Passenger Contract.—Performance:*    A passenger contract for "Passage. San Francisco to Honolulu," is not performed upon the anchorage of the vessel in the open roadstead outside of the port or harbor of the latter place.

*Same.—Stipulating Limited Liability.—Injury Arising from Carrier's Negligence:*  Carrier liable for injury to passenger's baggage outside of the limitations of the contract, where such injury is due to its own negligence.

*Presumption as to Condition of Passenger's Baggage:*  No presumption that passenger's baggage is in good order and condition at beginning of voyage or just prior to accident causing damage.

*Burden of Proof ,as to Condition of Baggage.—Nominal Damages:*  In action for damages against carrier for injury to baggage, burden on libellant to show the previous good order and condition,—failing which, but some injury being shown due to carrier's negligence, libellant is entitled to nominal damages only.

In Admiralty:   Libel *in Personam* for Damage to Baggage.

W. S. Edings and C. W. Ashford, Proctors for Libellant. Kinney, McClanahan & Cooper, Proctors for Libellee.

DOLE, J.  This is a libel *in personam* reciting that the libellee had been engaged as a common carrier by water of passengers from the port of San Francisco in the State of California, to the port of Honolulu, Territory of Hawaii; and that on the 18th day of March, 1905, the libellee as such common carrier received the libellant on board of its steamship "Mongolia," for the purpose of conveying him from said port of San Francisco to said port of Honolulu for the price charged therefor, which was paid; and at such time libellant was the owner of a certain suit case which, with its contents, was then and there delivered to the libellee for conveyance with him, the libellant,. on said steamship to the said port of Honolulu, and that said suit case and its contents were then and there in good order and

condition; that upon the arrival of the said steamship at Honolulu, such baggage was delivered by the libellee to the libellant not in good order, but it was damaged by salt water, which injury was not caused by any negligence on the part of the libellant but by the negligence of the libellee in failing to protect such baggage from becoming wet by salt water, and claiming damages for such injury in the amount of $1334.50.

The libellee, in its answer, admitting that it was the owner of the said steamship "Mongolia" and was engaged during the time mentioned in conducting business as a common carrier of passengers by water between the port of San Francisco and the port of Honolulu, alleged that at the time of the payment of the price for the passage of libellant from the said port of San Francisco to the said port of Honolulu, a certain contract in writing was entered into between the parties,—a copy whereof was filed and made a part of the answer,—and further alleges that being without information on which to form a belief as to the good order and condition of the said baggage and its contents, it denies the allegation relating thereto.

The answer further alleges that the libellee did not incur or guarantee the safe transportation of said baggage and its contents but merely bound itself to use reasonable care in its transportation and admits that when the said baggage arrived at the wharf at Honolulu it was not in good condition but was damaged by salt water, but avers that said damage was caused by negligence on the part of the libellant and not by the negligence of the libellee, and further claims in regard to the damage to said baggage that it was responsible only for wearing apparel limited in value to $150 in accordance with the terms of said written contract. The answer further alleges that in consideration of the price paid by libellant for transportation, the libellee agreed to transport libellant from San Francisco upon the conditions and limitations expressed in said contract in writing and that in accordance therewith did not undertake to disembark libellant or his baggage, and was not liable for the transporta-

tion of any other article beyond said amount of $150 in value and that under such limitation of liability it should not in any case pay libellant for the damage to the said suit case nor to any of the contents thereof excepting the wearing apparel of the libellant; that the said steamship "Mongolia" did not enter the port of Honolulu but anchored in the roadstead outside the harbor of said port; that previous to the disembarkation of passengers, notice was given to them that they would be transported to the shore in the steam-tug "Fearless," and that all baggage would be taken to the shore by a lighter; that the libellant neglected the care of said baggage and left the same upon the deck of the said steam-tug "Fearless," going ashore himself upon a private boat, and that notwithstanding such neglect, the servants of the libellee exercised due care of such baggage, and that owing to the roughness of the sea during the navigation of the "Fearless" from the "Mongolia" to the wharf at Honolulu, said suit case, by no negligence of libellee, was thrown into the sea by a sudden lurch of the "Fearless" and that the same was recovered and immediately sent to the residence of the libellant.

At the hearing, evidence was introduced by the libellee, subject to the objection of the libellant, as to the meaning of the word "port" in the contract to transport a passenger from the port of San Francisco to the port of Honolulu; and in connection with the libellee's evidence, the original ticket or contract of transportation between the parties was produced and made an exhibit in the case. Upon examination of this contract it does not appear that the word "port" has any significance in the case, for the contract reads, "This ticket with coupons at-"tached entitles Hon. J. K. Kalanianaole & Wife, first-class "passage. San Francisco to Honolulu," and the question arises under such contract, what the obligation of the libellee was in regard to landing the passengers of the steamship "Mongolia" in Honolulu. Counsel for libellee contend under the allegations of the answer that the contract was for transportation

from the port of San Francisco to the port of Honolulu, and
under the testimony of the witnesses as to the meaning of said
expression, that the voyage ended wherever the "Mongolia" an-
chored at or near the port of Honolulu. Now, as this allegation
is corrected by the words of the contract, the question is as to
the meaning of the words "first-class passage. San Francisco
to Honolulu."

The libellee in its answer alleges "that said steamship 'Mon-
"'golia' did not enter the port of Honolulu, but anchored in
"the roadstead outside the harbor of said port of Honolulu.'"
The case for the libellee appears to be weakened by this allega-
tion, for although it might be argued with some force that a
steamship entering a harbor or a port and anchoring therein
for good reasons instead of going to the wharf, had arrived at
the landing of such port, yet where the fact is that the ship did
not enter such port at all but anchored outside in an open road-
stead, it is doubtful whether it can be said that the voyage has
ended under such a contract as exists in this case. This doubt
is increased by the testimony of libellee's witnesses. It appears
from such evidence that sometimes the "Mongolia" came inside
the port of Honolulu and sometimes anchored outside when,
being heavily laden, her draught was too great to allow her to
enter. On this occasion, after the ship was anchored off the
port, the passengers were instructed by the officers of the ship
that the baggage was to be taken ashore in one boat and the
passengers in another, both of which boats were at the expense
of the company, no charges being made for conveying passengers
and baggage ashore. The reservations of the contract include
among other things, the following: "5. The company does not
"undertake to embark or disembark passengers or baggage."
From the above-mentioned action of the libellee, it would appear
either that it took the view that the voyage was not finished by
anchoring in the open roadstead off the port or that the com-
pany waived the reservation mentioned. The evidence of the
ship's officers is uncertain in character on this point, but tends

to support the theory that the libellee adopted the former alter-
native and assumed the resulting duty of transporting passen-
gers and baggage from the anchorage to the landing. Mr.
Rennie, the purser of the "Mongolia," after testifying as to the
practice of the company in regard to the port of Shanghai, in
which freight and passengers are lightered to the shore under
a special charge, said on the direct examination, "Q. I under-
"stand, then, you don't lighter free of charge at Honolulu. Of
"course we are dealing with this port particularly now. A. I
"am not sure about Honolulu." Part of the examination of
Mr. Andrew Dixon,—the first officer, was as follows: "Q.
"What was done in regard to the getting ashore of the passen-
"gers on that occasion, if you remember? A. What was done
"with regard to getting ashore of the passengers? Q. Yes.
"Was any means of transportation provided for them? A.
"Just a gangway, that is all. Q. From the gangway where did
"they go? A. Onto the Fearless. Q. Was that any part of
"the trip of the Mongolia? A. Yes sir. Q. Provided in this
"special case? A. Yes sir." From the testimony of Mr. Max
Thorschmidt,—the baggage steward of the "Mongolia," and of
the libellant, it appears that the baggage steward arranged with
the passengers before leaving the ship for the checking of their
baggage to the Union Transfer Company, as the baggage stew-
ard testified, "to facilitate the getting of the passengers off
"quickly and for the convenience of the passengers more or
less." This arrangement included such hand baggage in the
state-rooms as the owners did not choose to carry in their hands,
and included the dress suit case in question.

Under these circumstances I find that the voyage did not end
at the anchorage but extended to the wharf in this case.

Sections 2 and 10 of the conditions of the contract are as
follows: "2. It is mutually agreed that the carriers in interest
"shall not be liable (under this contract) beyond its own line
"nor for any loss or injury to person or property, occasioned
"by the act of God, of public enemy, perils of sea or other

"waters, fire, collision or other accidents of actual navigation; "restraints of government, nor for loss or damage by delay." "10. Passengers are allowed to carry as baggage wearing ap-"parel valued at $150, and said carriers shall not be liable for "other articles beyond that amount, except the value has been "previously declared and extra charges paid thereon."

While a common carrier may limit its responsibility for property conveyed, by a contract with the owner, no stipulation to relieve him from liability for loss resulting from his own negligence or misconduct is valid. Under this limitation of loss as to wearing apparel to $150 which has been agreed to by the libellant, the libellee would be liable for damages to clothing within that amount, unless such damage was due to the negligence of the libellant himself or to some of the causes excepted under Section 2 of the ticket, without negligence or misconduct on its own part.

The further question then arises whether the libellee is liable for anything beyond that amount if the loss was due to its negligence. The limitation of the liability of the carrier, stated in Section 2, being signed by the libellant is valid to the extent of relieving it from liability for such loss unless it was occasioned by its own negligence or misconduct. The libellant says the damage was done by the negligence of the libellee; the libellee denies this and says it was done by the negligence of the libellant.

As to the position of a common carrier under a limited contract, the Supreme Court of the United States takes a different view of the status of the carrier than that taken by some of the State courts, the latter holding that under such special agreement, the transportation company does not cease to be a common carrier nor change its relation to the public as such, and that he can only excuse himself for a failure to deliver the goods intrusted to him by showing that without his fault he has been prevented by some one of the causes recognized by law, or specifically provided for in the contract. *Graham & Co. v. Davis & Co.,* 4 Ohio St. 362, 379. Under the United States

authorities, "by the special agreement the common carrier be-
"comes, with reference to the particular transaction, an ordi-
"nary bailee and private carrier for hire.   *   *   *   But when
"such stipulation is made, and it does not cover losses from
"negligence or misconduct, we can perceive no just reason for
"refusing its recognition and enforcement." *York Company v.
Central Railroad,* 70 U. S. 107, 112, 113. Under these differ-
ent statements of principle, however, the result is substantially
the same, the carrier being, however, held to a somewhat greater
degree of responsibility under the former authorities than under
the latter.

The rule adopted by the Supreme Court of the United States
in cases of restricted liability of carriers under special agree-
ments, is stated in the case of *New Jersey Steam Navigation
Company v. Merchants' Bank,* (47 U. S. 343, 383), as follows:

"The respondents having succeeded in restricting their
liability as carriers by the special agreement, the burden of
proving that the loss was occasioned by the want of due care,
or by gross negligence, lies on the libellants, which would be
otherwise in the absence of any such restriction."

This rule appears to be modified in the case of *Railroad
Company v. Reeves,* 77 U. S. 176, 189, in which the injury
resulted from inevitable accident; the court said: "Now when
"it is shown that the damage resulted by this cause (act of
"God) immediately, he (the carrier) is excused;" the syllabus
on this point being, "When a common carrier shows that a loss
"was by some *vis major,* as by flood, he is excused without prov-
"ing affirmatively that he was guilty of no negligence."

In the cause at bar, the libellee alleged in his answer, "that
"he (the libellant) neglected to care for his baggage and left
"the same upon the deck of the said steam-tug "Fearless;" that
"notwithstanding the neglect of said libellant to care for his
"baggage, the servants of libellee exercised due care in the man-
"agement of said baggage; that owing to the roughness of the
"sea and during the navigation of said tug 'Fearless' from the
"side of the said steamship 'Mongolia' to the wharf of Hono-

"lulu, said suit case, through no negligence of libellee, was "thrown into the sea by a sudden lurch of said steam-tug 'Fear-" 'less'; that every effort was made to rescue said suit case from "the sea, and upon its being recovered it was sent to the resi-"dence of libellant at the earliest possible opportunity."

No testimony was introduced on either side, further explaining how the injury occurred, but the evidence in regard to the management of the baggage from the ship to the shore, satisfies me that the servants of libellee took charge of the same, and therefore that the negligence charged in the answer against the libellant, is without foundation. This conclusion is supported by the above allegation wherein it is claimed that "the servants "of the libellee exercised due care in the management of the "baggage" from the ship to the shore. It further appears from the evidence introduced by the libellee, that it was arranged by the libellee that "the baggage was to go on the 'Pioneer' and "the passengers on the 'Fearless.'" Under this arrangement the libellant's suit case was not where it ought to have been when it was left on the "Fearless," from which boat it fell into the sea, and so far as the evidence goes the placing it in such position cannot be attributed to anyone but the servants of the libellee who were in charge of it. The circumstances show neglect on the part of the libellee in leaving the suit case on the "Fearless" in a place where it could fall into the sea from a lurch of the craft. There is no evidence supporting a theory of inevitable accident,—the allegation of the answer "that ow-"ing to the roughness of the sea * * * the suit case was "thrown into the sea by a sudden lurch of the tug," being inadequate for such purpose, taken with the neglect of the libellee in placing it in an evidently insecure place and on the wrong boat. Under these circumstances the rule above referred to as to burden of proof does not apply, the injury appearing from the allegations of the answer to have been the natural consequence of the negligence of the libellee under the existing state of the weather, which does not appear to have been unusual.

The damage being therefore due to the negligence of the libellee, it is not relieved from liability therefor by the reservations of the contract of transportation.

Counsel for libellee contend that the evidence as to the value of the injured articles is based solely upon their original cost, and that that does not show that they were in good order and condition just prior to the accident; and as no evidence was given as to their value at that time, there is nothing before the court upon which to estimate the real loss.

The libel alleges that the suit case and its contents were in good order and condition at the beginning of the voyage; the answer denies this. There is no presumption of law that goods delivered to a carrier are in good condition at the time of the delivery. In an action for damages for injury to goods while in the hands of a carrier, if the plaintiff's allegation that he delivered the goods in good condition is denied by the defendant, the plaintiff must affirmatively show such good condition.

In the case at bar no evidence has been furnished by the libellant as to the condition of the suit case and its contents at the beginning of the voyage, and although it is apparent that some injury has been received through the negligence of the libellee, it is impossible for the court to decide how much. Under these circumstances the libellant is entitled only to nominal damages. The court will accordingly sign a decree for one dollar.

The court will further hear counsel as to costs.